STATE OF NORTH CAROLINA v. WILLIE RECO McNEIL

No. 8914SC793

(Filed 3 July 1990)

**1. Jury § 7.14 (NCI3d) — jury selection — peremptory challenges — no error**

There was no error in a prosecution for rape, burglary, and common law robbery in allowing the State to exercise

STATE v. McNEIL

[99 N.C. App. 235 (1990)]

four peremptory challenges against blacks where there was no prima facie case of discrimination and, although not required, the State articulated its reasons for its peremptory challenges.

**Am Jur 2d, Jury §§ 173-176, 233 et seq.**

2. **Jury § 7.8 (NCI3d)— jury selection—challenges for cause refused—no error**

There was no error in a prosecution for rape, burglary, and common law robbery in refusing to exclude two jurors for cause where one was employed as an Assistant Attorney General and the other may have glimpsed defendant in the hallway in handcuffs. The District Attorney offices operate independently of the Attorney General, the fact that both are employed by the State is insufficient to show prejudice, and the juror stated that he would be able to judge the case fairly. The trial court held a voir dire concerning the second juror and that juror stated that he did not see anything unusual and nothing that would impair his ability to be fair and impartial.

**Am Jur 2d, Jury §§ 214, 267, 327.**

3. **Rape and Allied Offenses § 4.3 (NCI3d)— victim's past sexual behavior—voir dire hearing—closed to public—no error**

There was no error in a prosecution for rape, burglary, and common law robbery in closing to the public a voir dire hearing to determine the relevance of the victim's past sexual behavior. Neither the public nor the defendant has a constitutionally protected interest in the disclosure of personal information of the victim's past sexual behavior unless it is determined to be relevant to the case being tried. N.C.G.S. § 8C-1, Rule 412.

**Am Jur 2d, Rape § 82.**

4. **Searches and Seizures § 7 (NCI3d)— events at defendant's house when defendant arrested—admissible**

There was no error in a prosecution for rape, burglary, and robbery in the court's refusal to exclude testimony of what occurred at defendant's home as fruit of an illegal entry where officers had probable cause to arrest defendant based on the victim's statement; the officers' failure to obtain a search warrant was not error in that there was every reason for

the officers to act to avoid the possibility of injury to the victim or her children; and the officers complied with the spirit of N.C.G.S. § 15A-401(e) if not the exact letter.

**Am Jur 2d, Searches and Seizures §§ 41-44.**

5. **Criminal Law § 66.11 (NCI3d) — defendant's refusal to allow viewing by victim — admissible**

There was no error in a prosecution for rape, burglary, and robbery in admitting testimony that defendant refused to allow the victim to view him immediately after his arrest where the victim had already named her attacker and the police were merely trying to determine if the man she thought was Reco McNeil was the same man who attacked her.

**Am Jur 2d, Evidence § 371.**

6. **Criminal Law § 41 (NCI3d) — resisting arrest — admissible as evidence of guilt**

There was no error in a prosecution for rape, burglary, and robbery in admitting testimony that defendant fought with law officers when they arrested him. The arrest was lawful and resisting arrest had some bearing upon the issue of guilt, similar to evidence of flight.

**Am Jur 2d, Evidence § 279.**

7. **Criminal Law § 55.1 (NCI3d) — blood and semen expert — cross-examination on DNA testing not allowed — no error**

There was no error in a prosecution for rape, burglary, and robbery by limiting defendant's cross-examination of the State's blood and semen expert concerning DNA testing where DNA testing was not done in this case. The court was well within its discretion in limiting cross-examination of the witness in a field outside her expertise, and there was no constitutional violation. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Evidence § 826.**

8. **Constitutional Law § 70 (NCI3d) — right to confrontation — cross-examination — witness's residence**

There was no constitutional error per se in a prosecution for rape, burglary, and robbery in refusing to permit defense counsel to ask a witness for the State his home address and place of employment where the witness testified that he had

briefly shared a jail cell with defendant, defendant had told him that he had gone to a woman's house and had sex with her, defendant had stated his name and that he lived in Durham, and the witness testified that he did not want to give his address because he had been harassed after testifying in a different case. The jury had a great deal of information about the witness which would tend to enable them to get a clear picture of who this witness was and his possible reasons for testifying and, under these circumstances, meaningful and open cross-examination was not thwarted.

**Am Jur 2d, Constitutional Law § 849.**

APPEAL by defendant from judgment entered 2 March 1989 by *Judge Samuel T. Currin* in DURHAM County Superior Court. Heard in the Court of Appeals 13 February 1990.

Defendant was indicted for second-degree rape, first-degree burglary, and common law robbery. After a jury trial, defendant was found guilty on all charges. The trial court imposed an active sentence of life imprisonment for the burglary conviction, forty years for the rape conviction (to begin at the expiration of the previous sentence), and ten years for common law robbery. This last sentence, which was to begin at the expiration of the other two, was suspended, with the provision that defendant be placed on supervised probation for five years at the time he is paroled or otherwise released.

Defendant appeals.

*Attorney General Lacy H. Thornburg, by Associate Attorney General Debra C. Graves, for the State.*

*Thomas F. Loflin, III for defendant-appellant.*

JOHNSON, Judge.

The State's evidence tended to show the following: Katrina McCoy, the prosecuting witness in this action, testified that she went to bed shortly after midnight on the morning of 15 June 1988. She was awakened by the sound of footsteps in her apartment and got out of bed to investigate. She saw a man in the bedroom doorway who got on top of Ms. McCoy and hit her left jaw with the back side of his fist. The blow caused Ms. McCoy to hit her

head on the headboard of her bed. The man continued to strike her and threatened to rape her. He then had vaginal intercourse with Ms. McCoy for about ten minutes. The man talked throughout this time, discussing acting as a pimp for the woman, saying he would take care of Ms. McCoy's two young daughters and son after he finished with her, and threatening to kill Ms. McCoy.

After ejaculating, the man shoved Ms. McCoy down the stairs, holding her by the hair and telling her he wanted her money. He searched Ms. McCoy's purse for money and finally found $1.00 in her daughter's wallet which was in Ms. McCoy's purse. The man was angry because there was not more money. The man continued during this time to jerk Ms. McCoy about by the hair. He dragged the woman into the kitchen by the hair as he looked for a knife. He stated that he wanted to cut Ms. McCoy's hair, but she feared he wanted to hurt her with a knife. The man became angry because he could not find a knife. Fearing that he might look in a certain drawer which held knives, Ms. McCoy began backing out of the kitchen. The man accused her of trying to see his face. Ms. McCoy did not reply, but thought that the statement was ridiculous because she already knew who the man was. He then put his hands around the woman's neck and started choking her. When he stopped choking her, Ms. McCoy unlocked the back door. The man heard the lock click, became angry, and threw Ms. McCoy down on the cement floor. He grabbed her up by the hair and, saying that it was time to go get the children, the attacker pushed Ms. McCoy toward the stairs. She dropped to the floor and grabbed him by the feet in an attempt to halt his progress towards her children. He pulled her up by the hair as he hooked his fingers inside her vagina. The man saw a broom on the floor and threatened to hit Ms. McCoy with it. He reached for it, but Ms. McCoy grabbed it first. They struggled with the broom. It broke; Ms. McCoy ended up with the handle part, and the man had the bristles. He dropped his part of the broom, turned, and dove out a living room window, with his left foot and head going through first. Ms. McCoy tried to hit her assailant with the broom handle as he left, but missed him and hit the window.

Ms. McCoy reported the crime. When the police arrived, she told them that she knew her attacker, and that he lived two doors away. She had met and talked with him six weeks earlier in back of her apartment. Her children were with her at the time. She

STATE v. McNEIL

[99 N.C. App. 235 (1990)]

also described the clothing worn by the intruder as a dark shirt and pants, sneakers and a belt buckle.

Ms. McCoy testified that she wears bifocals, but did not have them on during the attack. She also stated that there were no interior lights on at the time, but that street lights shined in the kitchen and living room windows.

Officer Allen testified that he was the first officer to arrive at the scene. He stated that Ms. McCoy told him that she had been raped by a man named Reco who lived two doors down in apartment D. Officer Allen and other officers went to the apartment. A teenage boy, who was defendant's brother, opened the door. Officer Allen asked him if defendant lived there. He said yes, and invited the officers in. At that point, defendant descended the stairs. Officer Allen asked defendant if he would allow Ms. McCoy to look at him. Defendant conferred with his mother and denied the request. Defendant was placed under arrest. He fought with the officers, but they overpowered him.

Detective Hester testified that he searched defendant's home pursuant to a search warrant and found a pair of khaki pants, a belt buckle, and a pair of white sneakers. He opined that the pattern on the sole of the sneakers was consistent with a photographed impression on Ms. McCoy's face.

The testimony of other witnesses for the State will be described as necessary to the questions raised by defendant.

Defendant offered no evidence.

[1] By his first Assignment of Error, defendant contends that the trial court erred in allowing the State to exercise the four peremptory challenges it used against black persons. We disagree.

It is well settled that purposeful discrimination in jury selection violates the equal protection clause of the Fourteenth Amendment to the U.S. Constitution. *Swain v. Alabama*, 380 U.S. 202, 13 L.Ed.2d 759 (1965). A prosecutor may exercise peremptory challenges for any reason as long as that reason is related to the prosecutor's view concerning the outcome of the case being tried. *State v. Batts*, 93 N.C. App. 404, 378 S.E.2d 211 (1989). However, the State may not challenge potential jurors solely on the basis of their race or on the assumption that black jurors would generally be unable to consider a charge against a member of the black

race impartially. *Batson v. Kentucky*, 476 U.S. 79, 90 L.Ed.2d 69 (1986).

Under *Batson*, if the defendant establishes a *prima facie* case of purposeful exclusion, then the prosecutor must come forward with clear and reasonably specific neutral explanations for its challenges. *Id.* In the instant case, we agree with the trial court that no *prima facie* case was made out by defendant. Four of the twelve jurors seated were black, as was the first alternate. The State used four of its peremptories against black potential jurors and did not exercise its remaining two peremptory challenges. Therefore, the State accepted over fifty percent of the prospective black jurors tendered, including the alternate. This is insufficient to show an intent by the prosecutor to keep persons of the black race off the jury. *State v. Abbott*, 320 N.C. 475, 358 S.E.2d 365 (1987); *State v. Robinson*, 97 N.C. App. 597, 389 S.E.2d 417 (1990). No questions or statements made by the prosecutor in any way implied an intent to discriminate against blacks in jury selection. The fact that defendant is black and the alleged victim is white is not sufficient to tip the balance in favor of creating a *prima facie* case since great deference is to be accorded the trial court in determining the existence of a *prima facie* case. *Batson, supra.*

Although not required when a *prima facie* is not established, the State wisely articulated the reasons for its peremptory challenges. One challenged juror's brother was on probation and she had been to court with him that week for a revocation hearing. She also knew personally a proposed defense witness. A second juror stated that he had once been falsely accused of a crime. A third had two convictions for driving while impaired and seemed unsure of himself in *voir dire*. The fourth was excused because one of the veteran detectives stated that he did not feel comfortable with him. We find the reasons given were reasonably specific and racially neutral. This argument is overruled.

[2] Second, defendant argues that the court erred in refusing to excuse two prospective jurors for cause. The first juror referred to is employed as an Assistant Attorney General for the State of North Carolina. A juror may be challenged for cause if he is unable to render a fair and impartial verdict. G.S. § 15A-1212(9). A person may not be excluded solely because of the nature of his employment. *State v. Hunt*, 37 N.C. App. 315, 246 S.E.2d 159, *cert. denied*, 295 N.C. 736, 248 S.E.2d 865 (1978). However, a rela-

tionship such as employment will disqualify a juror if the position is such that the juror is "subject to strong influences which [run] counter to defendant's right to a trial by an impartial jury." *State v. Lee*, 292 N.C. 617, 625, 234 S.E.2d 574, 579 (1977). While the juror was employed by the Attorney General's Office, defendant was prosecuted by an Assistant District Attorney of the Fourteenth Judicial District. District attorney offices operate independently of the Attorney General. The fact that the prosecutor and the juror are both employed by the State is insufficient to show prejudice. The juror stated that he would be able to judge the case fairly, and there is no evidence in the record to suggest otherwise.

Defendant argues that a second juror should have been excluded for cause because he may have glimpsed defendant in the hallway in handcuffs when the jurors were returning from lunch recess. Defense counsel raised the possible problem and the court immediately held a *voir dire*. The juror stated that he did not see anything unusual and nothing that would influence his ability to be fair and impartial. This argument is without merit.

[3] By his fourth argument, defendant urges that the court erred in closing to the public a *voir dire* hearing conducted to determine the relevance of Ms. McCoy's past sexual behavior. The hearing to determine relevance was held in camera as required by G.S. § 8C-1, Rule 412, known as the Rape Shield Statute. Defendant relies on *Waller v. Georgia*, 467 U.S. 39, 81 L.Ed.2d 31 (1984), which held that closure of a suppression hearing over the defendant's objection violated the accused's Sixth Amendment right to a public trial. We find the present case distinguishable. In *Waller*, the closed hearing was held to determine whether relevant evidence was inadmissible because obtained in violation of the defendant's Fourth Amendment rights. In the instant case, the *voir dire* was held to decide whether the victim's past sexual behavior was relevant at all. We do not see that the defendant or the public has a constitutionally protected interest in the disclosure of personal information of the victim's past sexual behavior unless it is determined to be relevant to the case being tried. This argument is overruled.

[4] By his sixth argument, defendant contends that testimony of what occurred in defendant's home should have been excluded at trial because, he argues, it was the fruit of an illegal entry. We disagree. It is undisputed that the officers had probable cause

to arrest defendant based on Ms. McCoy's statement that he was the intruder.

We do not find that the officers' failure to obtain a search warrant was error under the circumstances. G.S. § 15A-401(b) provides that an officer may make a warrantless arrest of any person if the officer has probable cause to believe that the person "[m]ay cause physical injury to . . . others . . . unless immediately arrested." *State v. Matthews*, 40 N.C. App. 41, 251 S.E.2d 897 (1979). In the case at bar, Ms. McCoy showed evidence of having been beaten; the window of her home had been completely broken out; and she stated that defendant, who lived two doors away, had threatened to kill her and her children. There was every reason for the officers to act to avoid the possibility of injury to Ms. McCoy or her children.

Before entering defendant's residence, Officer Allen knocked on the door and asked defendant's brother, who answered the door, if defendant was there. The brother said yes, and for the officer to come on in. Officer Allen immediately made it clear to defendant that he was there to investigate a felony. Defendant contends that the officer failed to give notice of his authority and purpose before entering as required by G.S. § 15A-401(e). We find no error. Officer Allen made no secret of his reason for being there, and defendant's brother invited him in. The officer complied with the spirit of section 401 if not the exact letter. Evidence found as the result of the entry need not be excluded as tainted. *State v. Sutton*, 34 N.C. App. 371, 238 S.E.2d 305 (1977), *cert. denied and appeal dismissed*, 294 N.C. 186, 241 S.E.2d 521 (1978).

[5] By his seventh argument, defendant contends that the court erred in admitting testimony that he refused to allow Ms. McCoy to view him immediately after his arrest. We doubt that under the facts of this case, that the viewing would have been as inherently suggestive as a "show-up" would have been since Ms. McCoy had already named her attacker, and police were merely trying to determine if the man she thought was Reco McNeil was the same man who attacked her. *See United States v. Wade*, 388 U.S. 218, 18 L.Ed.2d 1149 (1967). We are not aware that a defendant's refusal to be viewed in this type of situation is information which may not be commented on in the same way as a defendant's failure to testify. *See State v. Roberts*, 243 N.C. 619, 91 S.E.2d 589 (1956). This argument is overruled.

[6] We also find no merit to defendant's eighth argument that testimony that defendant fought with law enforcement officers when they arrested him should have been excluded. We have concluded above that the arrest of defendant was lawful. We believe that defendant's resisting arrest is properly viewed as bearing upon the issue of guilt, similar to evidence of flight. *State v. Parker*, 45 N.C. App. 276, 262 S.E.2d 686 (1980). This argument is without merit.

[7] By his ninth argument, defendant contends that the court violated his constitutional right to confront the witnesses against him when it limited his cross-examination of the State's blood and semen expert who had examined body fluids taken from Ms. McCoy after the rape. Defense counsel elicited from the expert witness that she knew of DNA testing, that the SBI was in the process of developing a laboratory for it, and that the expert would not be working in that area. DNA testing was not done on samples collected in the instant case. Defense counsel continued to ask about the type of results that might be obtained through DNA testing. At this point a *voir dire* was held in which the witness stated that she had never done DNA testing. The court ruled that she was not competent to testify as an expert on DNA testing. The court ruled that testimony elicited on *voir dire* regarding DNA was inadmissible pursuant to G.S. § 8C-1, Rule 403 because it would only tend to confuse the jury. We agree. The court was well within its discretion in limiting cross-examination of the witness in a field outside her expertise, and there was no constitutional violation. *See State v. Young*, 58 N.C. App. 83, 293 S.E.2d 209 (1982).

[8] By his tenth question, defendant argues that the court committed constitutional error *per se* by refusing to permit defense counsel to ask a witness for the State his home address and place of employment. Under the particular facts of this case, we do not find that this amounted to a violation of defendant's Sixth Amendment right of confrontation.

Ricky Clayton testified that he briefly shared a jail cell with defendant, and that defendant told him that he had gone to a woman's house and had sex with her. Defendant stated his name and that he lives in Durham. During *voir dire*, Clayton testified that he did not want to give his address because he had had problems of being harassed after testifying in a different case. The

STATE v. McNEIL

[99 N.C. App. 235 (1990)]

court sustained objections by the State to questions asking the witness his address and place of employment.

Defendant cites *Smith v. Illinois*, 390 U.S. 129, 19 L.Ed.2d 956 (1968), and *Alford v. United States*, 282 U.S. 687, 75 L.Ed. 624 (1931), for the proposition that a court's failure to allow a defendant to question an adverse witness about where he lives is a constitutional violation *per se*. In *Smith*, the defendant was not permitted to elicit either the correct name of the adverse witness nor his address. The witness gave a name at trial which he admitted on cross-examination was false.

We find a case from the Fifth Circuit interpreting and applying the holdings of *Smith* and *Alford* to be persuasive. The Court stated that "it appears to us that the purpose of *Alford/Smith* was to safeguard the opportunity for a meaningful and open cross-examination, not to require that a witness always divulge his or her home address." *United States v. Alston*, 460 F.2d 48, 51 (5th Cir.), *cert. denied*, 409 U.S. 871, 34 L.Ed.2d 122 (1972). The Court in *Alston* found no error in the District Court's refusal to order the government witness, an undercover narcotics agent, to reveal his home address. The Court went on to say that "the witness should have the opportunity to demonstrate to the trial judge that the defendant's solicitation of his or her home address constitutes only an attempt to 'harass, annoy or humiliate.' " *Id.* at 52; *McGrath v. Vinzent*, 528 F.2d 681 (1st Cir. Mass.), *cert. dismissed*, 426 U.S. 902, 48 L.Ed.2d 827 (1976); *State v. Thornton*, 309 So.2d 266 (1975); Annotation, *Right to Cross-examine Witness as to His Place of Residence*, 85 A.L.R. 533 (1978).

In the instant case, Ricky Clayton testified to his correct name, that he lived in Durham, that he had shared a jail cell with the defendant, and that he was presently on probation for breaking and entering. Detailed cross-examination also revealed that he had a lengthy criminal record, was testifying under subpoena, and had testified in previous criminal trials. On *voir dire*, the witness stated that he would rather not give his home address because he had had problems after testifying in another case and had been forced to leave Durham. We think that the jury heard a great deal of information about the witness which would tend to enable them to get a clear picture of who this witness was and his possible motivations for testifying. The witness had a reasonable fear of being harassed if his home address were made public since this

had happened to him before, to the extent of forcing him to leave Durham. We do not believe that under these particular circumstances that meaningful and open cross-examination was thwarted by the protection of Clayton's home address. This argument is overruled.

We have carefully reviewed defendant's remaining assignments of error and find them to be without merit.

No error.

Judges ARNOLD and ORR concur.