[No. S059827. Aug. 17, 2000.]

JOAQUIN ALVARADO, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

JORGE LOPEZ, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

1122

**COUNSEL**

Michael M. Crain, under appointment by the Supreme Court, for Petitioner Joaquin Alvarado.

Robert S. Gerstein, under appointment by the Supreme Court; Richard H. Millard and Tara Selver for Petitioner Jorge Lopez.

Paul L. Hoffman, Mark D. Rosenbaum and Dilan Esper for ACLU Foundation of Southern California as Amicus Curiae on behalf of Petitioner Jorge Lopez.

John T. Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Gil Garcetti, District Attorney, Brent Riggs and Brentford J. Ferreira, Deputy District Attorneys, for Real Party in Interest.

Kent S. Scheidegger and Charles L. Hobson for Criminal Justice Legal Foundation as Amicus Curiae on behalf of Real Party in Interest.

Latham & Watkins and Michael Bruce Abelson for Witness Protection Foundation as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

**GEORGE, C. J.**—In this case we must determine the validity of an order, entered prior to trial in a criminal action, that authorizes the prosecution to refuse to disclose to the defendants or their counsel, both prior to *and at trial*, the identities of the crucial witnesses whom the prosecution proposes to call at trial, on the ground that disclosure of the identities of the witnesses is likely to pose a significant danger to their safety.

Protecting the safety of witnesses unquestionably is of the utmost importance, and a trial court has broad discretion to deny, restrict, or defer disclosure of a witness's identity prior to trial in order to provide such protection (Pen. Code, § 1054.7). As we shall explain, however, we conclude in light of controlling constitutional authorities that the trial court and the Court of Appeal erred in determining that, when the risk to a witness is sufficiently grave, the identity of the witness may be *permanently* withheld from a defendant and the witness may testify *anonymously at trial*—even when the witness is a crucial prosecution witness and withholding the witness's identity will impair significantly the defendant's ability to investigate and cross-examine the witness.

As discussed hereafter, numerous decisions of both the United States Supreme Court and the California courts establish that whenever nondisclosure of a witness's identity will prevent the effective investigation and cross-examination of a crucial witness, the confrontation clause precludes the prosecution from relying upon the witness's testimony at trial while refusing to disclose the witness's identity. As the United States Supreme Court has explained: "[W]hen the credibility of a witness is in issue, the very

starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness'[s] name and address open countless avenues of in-court examination and out-of-court investigation. *To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.*" (*Smith v. Illinois* (1968) 390 U.S. 129, 131 [88 S.Ct. 748, 750, 19 L.Ed.2d 956], italics added, fn. omitted.)

Accordingly, we conclude that the challenged order must be vacated insofar as it authorizes, in advance of trial and without regard to the evidence and circumstances as they then may appear, the prosecution *permanently* to withhold the identity of these prosecution witnesses from the defense. At the same time, however, we emphasize that the trial court remains free to fashion a more limited order denying, restricting, or deferring disclosure of the identity of each witness *before* trial (including limiting disclosure to defendants' counsel), as long as that order does not impermissibly impair defendants' right to confront and cross-examine the witnesses effectively *at trial.*

## I.

On February 6, 1993, during the noon hour, Jose Uribe, an inmate at the Los Angeles County jail, was killed in his cell, having been stabbed 37 times with a contraband knife described as a shank. Three other inmates allegedly witnessed the incident.

Following an investigation by law enforcement officials, a complaint was filed charging defendants Joaquin Alvarado and Jorge Lopez with the first degree murder of Uribe. A third defendant, Frank Marquez, also was charged but is not a party to this proceeding. The prosecution provided discovery to the defense indicating that three inmates witnessed the killing. A magistrate ordered the prosecution to provide the defense with the identities of the witnesses prior to the commencement of the preliminary hearing, pursuant to Penal Code sections 1054.1, subdivision (a), and 1054.5.[1]

Instead of complying with the magistrate's order, the prosecution presented its case to a grand jury, which returned an indictment charging defendant Alvarado with murder (and alleging a prior-murder special circumstance) and conspiracy to commit murder, and charging defendant Lopez with murder, conspiracy to commit murder, and possession of a shank while in custody (on three occasions unrelated to the present incident). (§§ 187, 190.2, subd. (a)(2), 182, subd. (a)(1), 4574, subd. (a).) The prosecution is seeking the death penalty against Alvarado but not against Lopez.

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

The prosecution provided defendants with transcripts of the grand jury proceedings, in which the three inmate eyewitnesses are identified only as witnesses 1, 2, and 3. We summarize the testimony of the three witnesses before the grand jury.

Witness 1 testified that on the day of the murder, he was housed in cell No. 12. Witness 1 heard Marquez, a jail trusty, ask one of witness 1's two cellmates in Spanish for some extra jail clothing, mentioning something about a snitch. Witness 1 gave Marquez his shirt, hoping to curry favor with Hispanic inmates. Witness 1 remained in his cell during the noon hour because he was tired. He saw a group of five inmates, including defendants, near his cell. He then heard an altercation and observed the same group of five inmates leave the area.

Two days after the murder, during the course of the sheriff's department's investigation, witness 1 identified a photograph of Marquez as depicting the person to whom he gave his shirt, but six months later he selected another photograph identifying a different individual. Witness 1 told the grand jury that he had been confused regarding his earlier photographic identification. Witness 1 further testified that defendants were in the group of inmates he saw near his cell and that on the day immediately preceding his testimony before the grand jury, he was placed in the same jail cell as defendant Alvarado, who threatened to harm him if he testified.

Witness 2 testified that, on the morning of Uribe's death, Marquez came to cell No. 11, where witness 2 was housed. Marquez spoke to witness 2's cellmates in Spanish. Witness 2 believed that Marquez said a snitch was going to be dealt with in cell No. 10, and said witness 2 should stay away from cell No. 10. Approximately 10 minutes later, witness 2 heard a Black trusty inform certain Black inmates to stay away from the end of the row where cell No. 10 was located. Witness 2 remained in his cell around noon instead of going to lunch, because he wanted to eat the food he had purchased that morning at the commissary.

Around noon, witness 2 saw defendants Alvarado and Lopez, who were not assigned to cell No. 10, enter that cell with another inmate who was housed there. Witness 2 then heard an altercation inside cell No. 10 and something being said about being a snitch. Shortly thereafter, witness 2 saw Lopez give a bloody shirt to Marquez outside cell No. 10. Witness 2 also saw a bloody body lying under a bed inside cell No. 10. Marquez told witness 2 to return to his cell because the matter did not involve him.

As part of the investigation into Uribe's murder, witness 2 was shown photographs of inmates who had been in the area. Witness 2 identified

Marquez, Lopez, and Alvarado. (Witness 2 initially identified a different individual as having accompanied Lopez into cell No. 10. When thereafter shown Alvarado's photograph, witness 2 stated that his earlier identification had been mistaken.)

Witness 3 was a jail trusty assigned to sweep the module that contained cell Nos. 10, 11, and 12. On the morning of the murder, he saw Marquez wrap a shank inside a shirt and give it to another Hispanic inmate. After lunch, witness 3 saw Marquez take a shirt from someone on the same row.

The prosecution provided the defense with the grand jury transcripts and information regarding the witnesses' criminal histories, but did not provide the names or photographs of witnesses 1, 2, or 3.[2] The defense continued to seek the witnesses' true names and addresses. The prosecution then sought a protective order, authorizing it *permanently* to withhold disclosure of the witnesses' identities and photographs from defendants or their counsel on the ground that disclosure would place the witnesses' lives in danger.

Over defendants' objections, the trial court held a series of in camera hearings, *from which the defense was excluded*, to permit the prosecution to demonstrate good cause why disclosure of the witnesses' names and photographs should be denied. (§ 1054.7.) Based upon the evidence adduced at these hearings, the trial court found as follows:

"The evidence presented clearly established that witnesses 1 through 3 are in serious danger as a result of their participation in this case and that the disclosure of their names would likely increase the danger to them. Several facts support this conclusion, including the following:

"(1) The homicide is believed to have been ordered by the Mexican Mafia, a notorious prison gang, and that the defendants, who are not members of the gang, committed the homicide to gain favor with the Mexican Mafia.

"(2) The Mexican Mafia is well-known for retaliatory acts against . . . informants and government witnesses, including murder. [¶] Information disclosed in camera documented 12 incidents of murder or attempted murder at the county jail of inmates between 1988 through 1991 which were committed by or at the direction of the Mexican Mafia. The additional five murders linked to the Mexican Mafia during this period of time were committed on persons who were not incarcerated. [¶] The Mexican Mafia is

---

[2]The prosecution also provided the defense with information describing the witnesses' custodial status and with the police reports of their prior crimes. Copies of reports of interviews of other inmates were made available to the defense. Additionally, the prosecution provided the names and photographs of 33 other inmates who, on the date of the murder, resided in the county jail module where the killing occurred. Defendants also were provided with the names of every other inmate who resided in a nearby county jail module.

believed to have ordered the murders of witnesses in protective custody and incarcerated in other states . . . .

"(3) The Mexican Mafia has an excellent intelligence network which includes sources in several public agencies and is able to obtain confidential information. [¶] . . . [¶] Penetration [by] the Mexican Mafia of penal institutions is so extensive that one in camera witness described the organization as having 'de facto control' over all penal institutions in California.

"(4) . . . [T]he danger the Mexican Mafia poses to government witnesses is extreme. In camera, a witness stated that the Mexican Mafia has ordered so many hits and there are so many witnesses in protective custody that we cannot adequately protect them all.

"(5) The Mexican Mafia requires documentation which identifies an individual as a government witness before a contract to kill the witness is approved. The procedure for issuing contracts was described as follows: [¶] For contracts to be issued, one Mexican Mafia member alone cannot give the contract. He has to have that contract approved. [¶] The contract is approved in a manner where they meet, two or three members meet. They are presented with evidence. They have . . . what you would call a trial. It is informal. This evidence includes transcripts or paperwork . . . that would indict this person who has been a witness and that is why the name is so important.

"(6) A witness in the instant case was attacked and cut in jail after the killing in this case. The attacker was a member of the prison gang aligned with the Mexican Mafia and warned the witness not to testify. [¶] One of the defendants in this case threatened a witness while the witness was in protective custody and told the witness somebody would get him. [¶] Someone wrote on a wall while a witness was in a court holding cell that the witness was dead. And that the witness was a snitch at the time when the witness was in protective custody.

"(7) In the instant case, the homicide was committed in a manner which suggests highly organized criminal activity involving several persons. [¶] The victim arrived at the institution a single day or at most two days before the killing. This fact suggests that the group responsible for his killing had intelligence and organization. It was known that the [victim] was coming, where he would be and how to get to him. [¶] This sophisticated criminal activity involving the obtaining of shanks which, of course, [are] illegal to possess in the jail, getting the shanks to the floor [where] they could be used, obtaining the extra clothing so the killer could rid themselves [sic] of the blood-stained clothes, getting rid of the blood-stained clothes. [¶] The sophistication of the killing indicates no one is safe inside the county jail system and I think that also obtains to persons who are in prison within California and in prisons outside of California.

"Based on the foregoing and the other facts disclosed to the court in camera, it is clear that the witnesses 1 through 3 are in danger and that disclosure of their names would increase the risk of possible danger to them with a resulting possible los[s] of evidence; that is, their testimony, which has not been preserved in any usable way. [¶] So I find good cause has been shown to support that there is a danger to these witnesses.

"But I must say I continue to be troubled by the People's request to not turn over the names. It is a difficult issue for me. And even though I think good cause exists, I certainly am persuaded by [counsel for defendant Alvarado] Mr. Crain's argument and the arguments of counsel that for them to investigate the case in this situation, it makes it almost impossible to investigate without the names. . . ."

Based upon the foregoing findings, the trial court concluded that good cause for nondisclosure of the witnesses' true names had been established. The court therefore issued the following minute order: "[The] People's request to withhold the names of witnesses from the defense is granted. The witnesses will be made available for interview by defense counsel 30 (thirty) days before trial. The witnesses are not required to state their names, but, may do so at their own volition."

Defendants thereafter sought writ review of the trial court's order. The Court of Appeal denied defendants' petitions for writ of mandate. Defendants thereafter sought review from this court. We granted review and transferred the matters to the Court of Appeal, with directions to that court to vacate its order denying mandate and to issue an alternative writ to be heard before that court. The Court of Appeal, upon discovering a discrepancy between the trial court's minute order and the reporter's transcript, remanded the case to the trial court, which issued a new minute order clarifying its ruling and providing as follows: (1) the prosecution is authorized *permanently* to withhold from the defense the identities of the three witnesses; (2) the prosecution is to produce the witnesses for interview by defense counsel 30 days prior to trial, although the witnesses are not required to speak to defense counsel, and if they do, they may—but are not required to— disclose their names; (3) if defense counsel learn the witnesses' names, they may not disclose the names to defendants; and (4) at trial, the witnesses may —but are not required to—disclose their names, but their appearance will not be disguised.

Both defendants thereafter sought further writ review from the Court of Appeal, which consolidated the two petitions, issued an order to show cause, and ultimately resolved the matter in a written opinion rendered by a divided court.

In its opinion, the majority of the Court of Appeal determined that the trial court properly had exercised its discretion in authorizing the prosecution permanently to withhold the witnesses' identities from the defense, based upon the trial court's finding that disclosure of the witnesses' names "would place them in mortal danger. . . ." In so holding, the majority acknowledged that under the trial court's order "[d]efendants will have difficulty obtaining complete information about the witnesses' location and ability to observe and testify about the crime. Moreover, defendants will be unable to obtain complete impeaching information, such as the witnesses' reputation for truthfulness or dishonesty, previous history and accuracy of providing information to law enforcement, and other motives to fabricate, such as revenge or reduction or dismissal of their own charges." In sum, the majority conceded that the trial court's nondisclosure order would seriously limit defendants' effective investigation and cross-examination of the witnesses, "significantly impair[ing]" defendants' constitutional rights to confrontation and to due process of law. Nonetheless, the majority concluded that in light of the potentially grave danger to the witnesses, the impairment of defendants' ability to cross-examine and impeach the witnesses was not unconstitutional. In reaching this conclusion, the Court of Appeal majority expressly disagreed with the conclusion reached in *People v. Brandow* (1970) 12 Cal.App.3d 749 [90 Cal.Rptr. 891] (*Brandow*), in which the appellate court held that disclosure of the identity of a witness constitutes "an essential element in the protection of the defendant's right to a fair trial." (12 Cal.App.3d at p. 755.)[3]

The dissenting justice in the Court of Appeal challenged the majority's analysis of the relevant case law and criticized the majority for according undue weight to the threat of retaliation against the prosecution's witnesses at the expense of defendants' constitutional rights. Questioning the ultimate effectiveness of the trial court's nondisclosure order, the dissent observed that "in addition to trying to dissuade adverse witnesses from

---

[3]In discussing the danger posed to the prosecution witnesses, the Court of Appeal majority emphasized the threats by the Mexican Mafia found by the trial court, observing: "One of the witnesses was attacked and warned against testifying by an inmate aligned with the Mexican Mafia. [Defendant] Alvarado threatened a witness while he was in protective custody. While one of the witnesses was in court, someone wrote on his cell wall that he was dead." In addition to noting that the trial court found that defendant Alvarado had threatened one of the witnesses, the Court of Appeal also observed that "both of the other witnesses received specific threats designed to dissuade them from testifying." The majority concluded that disclosure of the witnesses' names to the defense would further endanger the witnesses, because the Mexican Mafia then could determine who they are.

In the briefs filed in this court, defendants note that the hearings conducted by the trial court (prompted by the prosecution's concerns for the safety of its witnesses) were held outside the presence of defendants and defense counsel, and that the transcript of that hearing was sealed. Defendants explain that under these circumstances, they are in no position to challenge the trial court's findings regarding the alleged danger to the witnesses.

testifying, it is also part of the Mexican Mafia's arsenal to retaliate against such witnesses once their testimony has been given. Here, although the likelihood that the People will be able to bring this case to trial may be enhanced by the order of nondisclosure, once the witnesses have appeared in open court and thereby been subjected to the scrutiny of the Mexican Mafia's extensive intelligence network, what protection the nondisclosure order previously afforded could well be rendered meaningless."

We again granted defendants' petitions for review, on this occasion in order for us to determine whether the trial court's order, by permitting the prosecution's crucial witnesses to testify anonymously at trial, violates defendants' constitutional rights to due process of law and to confront the witnesses against them.

## II.

Proposition 115, approved by the voters in June 1990, included provisions amending the California Constitution and the Penal Code in numerous respects, one of which explicitly authorizes reciprocal discovery in criminal cases. (Cal. Const., art. I, § 30, subd. (c); Pen. Code § 1054 et seq.; *People v. Tillis* (1998) 18 Cal.4th 284, 289 [75 Cal.Rptr.2d 447, 956 P.2d 409].)[4] Among the statutory revisions implementing the pretrial discovery provisions of the initiative was the addition of sections 1054 through 1054.8, setting forth pretrial discovery procedures to be followed in criminal cases. Included within these procedures is the requirement that a prosecutor disclose the names and addresses of the individuals whom he or she intends to call at trial. (§ 1054.1, subd. (a).) The disclosure may be made to defense counsel, who is prohibited from revealing, to the defendant or others, information that identifies the address or telephone number of the prosecution's potential witnesses, absent permission by the court after a hearing and a showing of good cause. (§ 1054.2.) Before a party may seek court enforcement of any disclosure required by the pretrial discovery statutes, the party must make an informal request for the desired materials and information; if disclosure is not made within 15 days of the request, the party may seek a court order requiring disclosure, and a court may enter any order necessary to enforce the statutory provisions, including an order directing immediate disclosure. (§ 1054.5.) Absent a formal court order directing earlier disclosure, discovery must be provided at least 30 days prior to trial, "unless good

---

[4]We upheld the constitutionality of the reciprocal discovery provisions of Proposition 115 in *Izazaga v. Superior Court* (1991) 54 Cal.3d 356 [285 Cal.Rptr. 231, 815 P.2d 304]. (See also *In re Littlefield* (1993) 5 Cal.4th 122 [19 Cal.Rptr.2d 248, 851 P.2d 42] [holding that the applicable discovery statutes authorize an order requiring defense counsel to acquire and disclose to the prosecution the address, if reasonably accessible, of a person whom the defense intends to call as a witness, and also authorize a contempt sanction for refusal to obey such an order].)

cause is shown why a disclosure should be denied, restricted, or deferred." (§ 1054.7.) "Good cause" is defined for purposes of this provision as "threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigation by law enforcement." (*Ibid.*) Section 1054.7 additionally provides that upon the request of any party, the court may permit a showing of good cause— for the denial or regulation of disclosures—to be made in camera.[5]

As noted, on the basis of the evidence presented by the prosecution at the in camera hearing in this case, the trial court found that good cause existed to permit the prosecution to withhold the identities of the witnesses because disclosure was likely to pose a serious danger to their safety. The court ruled that the prosecution was required only to make the witnesses available for interviews by the defense 30 days prior to trial, and that the witnesses need

---

[5]Section 1054.1 provides in pertinent part: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following . . . information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] (a) The names and addresses of persons the prosecutor intends to call at trial. . . ."

Section 1054.2 provides: "(a)(1) Except as provided in paragraph (2), no attorney may disclose or permit to be disclosed to a defendant, members of the defendant's family, or anyone else, the address or telephone number of a victim or witness whose name is disclosed to the attorney pursuant to subdivision (a) of Section 1054.1, unless specifically permitted to do so by the court after a hearing and a showing of good cause.

"(2) Notwithstanding paragraph (1), an attorney may disclose or permit to be disclosed the address or telephone number of a victim or witness to persons employed by the attorney or to persons appointed by the court to assist in the preparation of a defendant's case if that disclosure is required for that preparation. Persons provided this information by an attorney shall be informed by the attorney that further dissemination of the information, except as provided by this section, is prohibited.

"(3) Willful violation of this subdivision by an attorney, persons employed by the attorney, or persons appointed by the court is a misdemeanor."

Section 1054.5 provides in pertinent part: "(a) No order requiring discovery shall be made in criminal cases except as provided in this chapter. . . . [¶] (b) Before a party may seek court enforcement of any of the disclosures required by this chapter, the party shall make an informal request of opposing counsel for the desired material and information. If within 15 days the opposing counsel fails to provide the materials and information requested, the party may seek a court order. Upon a showing that a party has not complied with . . . the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. . . ."

Section 1054.7 provides in pertinent part: "The disclosures required under this chapter shall be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. . . . 'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement. [¶] Upon the request of any party, the court may permit a showing of good cause for the denial or regulation of disclosures, or any portion of that showing, to be made in camera."

not disclose their names or even submit to the interviews. On remand from the Court of Appeal, the trial court subsequently clarified its order, reiterating that the prosecution must make the witnesses available for interviews by the defense, but further specifying that the witnesses' identities need not be disclosed to the defense unless the witnesses themselves choose to reveal their identities (in which case the attorneys would be precluded from disclosing the witnesses' identities to their clients). The trial court further clarified that its intent was to authorize the prosecution to withhold the witnesses' identities (and their photographs) from defendants and their counsel both at the pretrial discovery stage *and at trial.* The trial court further ordered that the witnesses need not submit to interviews by the defense.

Defendants do not contend that the trial court's finding that disclosure of the witnesses' names and photographs would pose a potential danger to the safety of the witnesses does not constitute "good cause" within the meaning of section 1054.7, but they maintain that, under the circumstances of the present case, the trial court's order—upholding the prosecution's authority to withhold disclosure of the witnesses' identities at trial—violates their rights, as guaranteed by the United States Constitution, to due process of law and to confront the witnesses against them. The resolution of this case turns upon these federal constitutional issues.[6]

### III.

In analyzing defendants' federal constitutional claims, it is helpful to discuss separately two aspects of the trial court order before us: (1) the validity of that order insofar as it permits the prosecution to decline to disclose the witnesses' identities to the defense before trial, and (2) the validity of the trial court's order insofar as it permits the prosecution to continue to withhold the witnesses' identities at trial.

 With regard to the first issue—i.e., disclosure of the witnesses' identities before trial—section 1054.7 establishes that a trial court has discretion to deny, restrict, or defer disclosure for good cause. Good cause, as defined in the statute, expressly includes "threats or possible danger to the safety of a victim or witness." (*Ibid.*) Petitioners have cited no authority that suggests that the statute, in this respect, is unconstitutional under either the confrontation clause or the due process clause. (See generally *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 52 [107 S.Ct. 989, 999, 94 L.Ed.2d 40] (plur. opn. of Rehnquist, C. J.) ["the right to confrontation is a trial right" (italics

---

[6]Defendants have not raised any claim under the California Constitution, and therefore we need not and do not address any state constitutional issue.

omitted)]; *Weatherford v. Bursey* (1977) 429 U.S. 545, 559 [97 S.Ct. 837, 845-846, 51 L.Ed.2d 30] ["It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case, and *Brady* [*v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215]] did not create one . . . ."]; *Wardius v. Oregon* (1973) 412 U.S. 470, 474 [93 S.Ct. 2208, 2212, 37 L.Ed.2d 82] ["[Although] the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded [citation], it does speak to the balance of forces between the accused and his accuser."]; *People v. Hammon* (1997) 15 Cal.4th 1117, 1124-1128 [65 Cal.Rptr.2d 1, 938 P.2d 986] ["we decline to extend the defendant's Sixth Amendment rights of confrontation and cross-examination to authorize pretrial disclosure of privileged information"]; cf. 4 LaFave et al., Criminal Procedure (2d ed. 1999) § 20.3 (m), pp. 883-884 & fn. 231 [citing several cases in which "state courts have occasionally found due process violated where the prosecution's failure to disclose certain critical portions of its evidence before trial deprived the defendant of an adequate opportunity to prepare to meet the prosecution's case"].) Like California, other states that generally authorize pretrial discovery of the identities of witnesses whom the prosecution intends to call at trial provide at the same time for an exception in instances in which disclosure may pose a danger to a witness's safety (see 4 LaFave et al., *supra*, § 20.3 (h), pp. 869-870 & fns. 150-153), and we are unaware of any case that suggests that the denial of pretrial disclosure in such circumstances is constitutionally impermissible.

Even before Proposition 115 added section 1054.7 to the Penal Code, this court had recognized that a trial court retains considerable discretion to protect a witness's identity before trial. In *People v. Lopez* (1963) 60 Cal.2d 223 [32 Cal.Rptr. 424, 384 P.2d 16], the defendants sought disclosure of the names and addresses of certain prospective prosecution witnesses during the pretrial stage of the proceeding. The prosecution opposed immediate disclosure on the ground that the witnesses "were in 'fear of physical injury or death'" (60 Cal.2d at p. 245), and after conducting a hearing on the issue, the court denied the defendants' request for immediate disclosure of the witnesses' identities but ordered the prosecution to provide the information to the defense shortly before the witnesses were to be called to testify at trial.

On appeal of their subsequent convictions, the defendants contended that the trial court committed prejudicial error in denying their motion for immediate disclosure of the identities of the prospective witnesses prior to trial. In *Lopez*, this court rejected the contention, explaining that "*in special circumstances* [the state may] have cogent reasons for keeping confidential

—in order to give some assurance that the truth can be presented—the names of prospective witnesses. There must be a balancing of the right of a defendant to discover potentially material witnesses with the probability that such discovery might lead to the elimination of an adverse witness or the influencing of his testimony. In balancing these competing factors the trial court must be allowed great discretion. [Citation.] . . . [¶] The court's order delaying disclosure was, undoubtedly, a conscientious effort on the part of the court to balance the claimed right of defendants to immediate disclosure with realistic danger inherent in such disclosure. It is the *timeliness* rather than the *immediacy* of disclosure which should control. In view of the facts before the court, we cannot say that the court abused its discretion by ordering disclosure delayed until shortly before the subject witnesses were to be called." (*People v. Lopez, supra,* 60 Cal.2d at pp. 246-247, italics in the original.)

In the case before us, the evidence presented to the trial court clearly justified its order protecting the witnesses' identities before trial. In view of the circumstances of the offense—a jailhouse murder with likely prison gang involvement and crucial prosecution witnesses who themselves were jailhouse inmates and thus particularly vulnerable to threats, coercion, or violent acts of other inmates, the trial court clearly had discretion to permit the prosecution to withhold pretrial disclosure of the witnesses' names and photographs. Particularly in a capital case, where pretrial preparation and investigation often extend over a considerable period of time, early disclosure of the identity of a vulnerable and threatened witness greatly may increase the danger of "the elimination of an adverse witness or the influencing of his testimony." (*People v. Lopez, supra,* 60 Cal.2d at p. 247.)

Accordingly, we conclude the challenged order clearly is valid insofar as it authorizes the prosecution to refrain from immediately disclosing the inmate witnesses' identities to the defense.

### IV.

As noted, however, the trial court's order in this case—particularly as clarified after remand—did not simply authorize the prosecution to deny the disclosure of the witnesses' identities before trial, but rather went further and ruled that the prosecution *permanently* could withhold the witnesses' identities from the defense, even during (and after) their testimony at trial. Although the Court of Appeal recognized that this aspect of the order would, as a practical matter, seriously impair defendants' ability to investigate the witnesses' backgrounds and credibility (as the trial court also recognized) and would affect adversely their constitutional right of cross-examination,

the Court of Appeal majority ultimately concluded that, because of the seriousness of the danger faced by the witnesses, even the complete withholding of this information from the defense at trial does not violate defendants' constitutional rights.

As the Court of Appeal also recognized, the aspect of the trial court's order authorizing the prosecution to withhold permanently from the defense the names of witnesses who are to testify at trial directly implicates defendants' rights under the confrontation clause of the federal Constitution. Thus, in analyzing the validity of the Court of Appeal's decision nonetheless to uphold the trial court's order permitting nondisclosure at trial, we examine the governing authorities under the federal confrontation clause.[7]

### A.

■ The Sixth Amendment guarantees the right of an accused in a criminal prosecution " 'to be confronted with the witnesses against him.' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 [106 S.Ct. 1431, 1435, 89 L.Ed.2d 674].) "The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Pointer v. Texas* 380 U.S. 400 [85 S.Ct. 1065, 13 L.Ed.2d 923] (1965), 'means more than being allowed to confront the witness physically.' *Davis v. Alaska*, [*supra*], 415 U.S. at p. 315 [94 S.Ct. at p. 1110]. Indeed, ' "[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" ' (*Id.*, at pp. 315-316 [94 S.Ct. at p. 1110] (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940) (emphasis in original)." (*Delaware v. Van Arsdall, supra*, 475 U.S. 673, 678 [106 S.Ct. 1431, 1435].) "[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law." (*Pointer v. Texas* (1965) 380 U.S. 400, 405 [85 S.Ct. 1065, 1068, 13 L.Ed.2d 923].)[8]

"[T]he right of an accused to be confronted with the witnesses against him must be determined by the same standards whether the right is denied in a

---

[7]Unlike the order in *People v. Hammon, supra*, 15 Cal.4th 1117, which involved only the question of *pretrial* disclosure of information, the trial court order here at issue explicitly authorizes nondisclosure of the witnesses' identities even during (and after) their testimony at trial. As the court in *Hammon* made clear, our decision in that case did not purport "to address the application *at trial* of the [confrontation clause] principles articulated in *Davis* [*v. Alaska* (1974)] 415 U.S. 308 [94 S.Ct. 1105, 39 L.Ed.2d 347]." (*Hammon, supra*, 15 Cal.4th at p. 1128.) The People acknowledge that insofar as the trial court's order authorizes the witnesses to testify anonymously at trial, the order implicates defendants' right of confrontation under the federal Constitution.

[8]Confrontation and cross-examination "have ancient roots" (*Greene v. McElroy* (1959) 360 U.S. 474, 496-497 [79 S.Ct. 1400, 1413-1414, 3 L.Ed.2d 1377]), "with a lineage that traces

federal or state proceeding. . . ." (*Pointer v. Texas, supra*, 380 U.S. 400, 407-408 [85 S.Ct. 1065, 1070].) The right of confrontation is not absolute,

---

back to the beginnings of Western legal culture." (*Coy v. Iowa* (1988) 487 U.S. 1012, 1015 [108 S.Ct. 2798, 2800, 101 L.Ed.2d 857].) The right of a defendant to know his or her accusers and to mount a defense against them can be traced back to the time of the Roman Empire and the sedition trial of the Apostle Paul in the year 60 A.D. (*Ibid.*; see also Berger, *The Deconstitutionalization of the Confrontation Clause: A Proposal for a Prosecutorial Restraint Model* (1992) 76 Minn. L.Rev. 557, 569 (Berger); Ishola, *Of Confrontation: The Right Not to Be Convicted on the Hearsay Declarations of an Accomplice*, 1990 Utah L. Rev. 855, 859.)

This ancient right of confrontation took an intriguing evolutionary turn in medieval England. Beginning around the year 1290, a group of officials appointed by the King of England "began regularly to advise the king on the resolution of legal disputes which were of interest to the Crown. The Privy Council, as the group came to be called, also performed several other executive functions. By the mid-fourteenth century, when the Privy Council acted as a court, it sat in a room at Westminster ornamented with the king's star-shaped seal. The Council-as-tribunal came to be known as the Star Chamber." (*U.S. v. Gecas* (11th Cir. 1997) 120 F.3d 1419, 1446, fn. omitted (*Gecas*).)

The Star Chamber helped to maintain the Crown's control over its enemies by adopting an inquisitorial system of criminal procedure—forgoing the use of juries, dispensing with established criminal procedure, and relying upon unidentified accusers. (Berger, *supra*, 76 Minn.L.Rev. 557; see also *In re Oliver* (1948) 333 U.S. 257, 269, fn. 22 [68 S.Ct. 499, 505, 92 L.Ed. 682] ["[T]he accused himself was grilled in secret, often tortured, in an effort to obtain a confession . . . ."]; *U.S. v. Cojab* (2d Cir. 1993) 996 F.2d 1404, 1407 ["A defendant's trial was based on charges made by persons whose identities were not disclosed, and he could be examined under torture, with the ultimate decision left to a court sitting without a jury."]; New Encyclopedia Britannica (15th ed. 1990) p. 218.) The Puritan nonconformists of the early 17th century protested against the Crown's reliance upon inquisitorial tactics, departing England for Plymouth Colony in 1620 "partly because of the repressive techniques of the . . . Star Chamber." (*Gecas, supra*, 120 F.3d 1419, 1449.)

The excesses of the Star Chamber ultimately led to its elimination. "[A] resolution of Parliament . . . condemned the Star Chamber's methods as 'illegal' and 'tyrannical,' thus giving the right to confront [one's] accusers a strong endorsement." (Note, Criminal Constitutional Law—*Eighth Circuit Applies the Confrontation Clause at a Sentencing Hearing— United States v. Fortier, 911 F.2d 100 (8th Cir. 1990)* (1991) 17 Wm. Mitchell L. Rev. 829, 832, fns. omitted.) The Star Chamber was abolished in 1641. (*In re Oliver, supra*, 333 U.S. 257, 266 [68 S.Ct. 499, 504]; see also *Faretta v. California* (1975) 422 U.S. 806, 821 [95 S.Ct. 2525, 2534, 45 L.Ed.2d 562], fn. omitted [the Star Chamber was a "curious institution . . . [that] has for centuries symbolized disregard of basic human rights"]; *Pate v. State* (Okla.Crim.App. 1967) 429 P.2d 542, 545 [tracing the rise and fall of the Star Chamber].)

The colonists who emigrated from England to North America in the 17th and 18th centuries brought with them a belief in the right of confrontation. Thus, guarantees of confrontation were included within the colonial constitutions of Massachusetts, New Hampshire, North Carolina, Maryland, and Virginia, and "it appears to have been assumed that a confrontation provision would be included in the Bill of Rights that was to be added to the Constitution after ratification." (*California v. Green* (1970) 399 U.S. 149, 175, fn. 6 [90 S.Ct. 1930, 1944, 26 L.Ed.2d 489] (conc. opn. of Harlan, J.).) The primary purpose of the confrontation clause ultimately set forth in the Sixth Amendment was to prevent the abuses that had occurred in England. (*Mattox v. United States* (1895) 156 U.S. 237, 242-243 [15 S.Ct. 337, 339-340, 39 L.Ed. 409]; see also *California v. Green, supra*, 399 U.S. at p. 156 [90 S.Ct. at p. 1934];

however (*Maryland v. Craig* (1990) 497 U.S. 836, 849 [110 S.Ct. 3157, 3165-3166, 111 L.Ed.2d 666]; *Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [93 S.Ct. 1038, 1045-1046, 35 L.Ed.2d 297]; *In re Elizabeth T.* (1992) 9 Cal.App.4th 636, 640 [12 Cal.Rptr.2d 10]), "and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (*Chambers v. Mississippi, supra,* 410 U.S. at p. 295 [93 S.Ct. at p. 1046].)

 In order to consider how these fundamental principles should be applied in the present case, we examine the relevant case law, set forth below.

In *Alford v. United States* (1931) 282 U.S. 687 [51 S.Ct. 218, 75 L.Ed. 624] (*Alford*), the defendant was convicted of using the mails to defraud, based upon damaging testimony given on direct examination by a former employee of the defendant. On cross-examination, when the defense sought to elicit the witness's place of residence, the prosecution objected on the ground that such information was immaterial. Defense counsel insisted that the questions were proper, the jury being entitled to know " 'who the witness is, where he lives and what his business is.' " (*Id.* at p. 689 [51 S.Ct. at p. 218].) The trial court rejected defense counsel's arguments and sustained the objection. The court of appeals affirmed.

In reversing the judgment on the ground that the trial court's curtailment of the cross-examination of the prosecution witness was an abuse of discretion and constituted prejudicial error, the United States Supreme Court held that "[c]ross-examination of a witness is a matter of right. [Citation.] Its permissible purposes, among others, are that the witness may be identified with his community so that independent testimony may be sought and offered of his reputation for veracity in his own neighborhood . . . . [¶] . . . It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the

Heller, The Sixth Amendment to the United States Constitution: A Study in Constitutional Development (1969) p. 104.)

Although the historical *underpinnings* of the confrontation clause are reasonably clear, the intended *reach* of the clause has been viewed as enigmatic. (See Berger, *supra,* 76 Minn.L.Rev. at p. 562 ["Little information exists about precisely what the concept of confrontation signified in the seventeenth and eighteenth centuries in England and the colonies."].) "[T]he Confrontation Clause comes to us on faded parchment. History seems to give us very little insight into the intended scope of the Sixth Amendment Confrontation Clause. . . ." (*California v. Green, supra,* 399 U.S. 149, 173-174 [90 S.Ct. 1930, 1943] (conc. opn. of Harlan, J.).) "From the scant information available it may tentatively be concluded that *the Confrontation Clause was meant to constitutionalize a barrier against* flagrant abuses, *trials by anonymous accusers,* and absentee witnesses." (*Id.,* at p. 179 [90 S.Ct. at p. 1946] (conc. opn. of Harlan, J.), italics added.)

weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. [Citations.] . . . [¶] . . . The question 'Where do you live?' was not only an appropriate preliminary to the cross-examination of the witness, but on its face, without any such declaration of purpose as was made by counsel here, was an essential step in identifying the witness with his environment, to which cross-examination may always be directed. [Citations.]" (*Alford, supra,* 282 U.S. 687, 691-693 [51 S.Ct. at pp. 219-220]; see also *Roviaro v. United States* (1957) 353 U.S. 53, 60-61 [77 S.Ct. 623, 627-628, 1 L.Ed.2d 639] [holding that where the disclosure of an informant's identity is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the government's privilege to withhold from disclosure the informant's identity "must give way"].)

In *Smith v. Illinois, supra,* 390 U.S. 129 (*Smith*), the defendant was convicted of the illegal sale of narcotics, following a trial in which the prosecution's principal witness testified that he had purchased heroin from the defendant in a restaurant. On cross-examination, the witness was asked whether the name by which he had identified himself on direct examination was his correct name. He admitted, over the prosecutor's objection, that it was not. The witness was then asked to state his correct name. The trial court sustained the prosecutor's objection to the question. The witness subsequently was asked where he lived, and again the court sustained the prosecutor's objection.

In reversing the judgment because of federal constitutional error, the United States Supreme Court observed that there had *not been a complete denial* of the defendant's right of cross-examination. "But the [defendant] was denied the right to ask the principal prosecution witness either his name or where lived, although the witness admitted that the name he had first given was false. *Yet when the credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness'[s]* name and address open countless avenues of in-court examination and out-of-court investigation. *To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.*" (*Smith, supra,* 390 U.S. 129, 131 [88 S.Ct. 748, 750], italics added, fn. omitted.) Accordingly, the high court held in *Smith* that the trial court's ruling violated the defendant's constitutional right of confrontation.[9]

---

[9]Neither *Alford, supra,* 282 U.S. 687, nor *Smith, supra,* 390 U.S. 129, addressed the question whether nondisclosure of a witness's identity might be justified by a need to protect the safety of the witness. In a concurring opinion to the court's decision in *Smith,* however, Justice White (joined by Justice Marshall) observed: "In *Alford* . . . the Court recognized that

## B.

In 1970, two years after the United States Supreme Court handed down its decision in *Smith, supra,* 390 U.S. 129, the Court of Appeal decided *Brandow, supra,* 12 Cal.App.3d 749. As noted, the Court of Appeal in the present case expressly disagreed with *Brandow.* In *Brandow,* the defendant was charged with one count of pandering and one count of attempted pandering. The principal witness against him was one Michelle Dupree, the assumed name of a woman who had engaged in prostitution prior to agreeing to cooperate with the police by tape-recording her telephone calls. At trial, the witness testified that Michelle Dupree was not her true name, and the court, after hearing evidence outside the presence of the jury regarding threats to the witness's safety and "physical harm and abuse which had already been inflicted upon her," sustained the prosecutor's objection to a question, asked by defense counsel on cross-examination, seeking the witness's true identity. (*Brandow, supra,* 12 Cal. App. 3d 749, 754.)

On appeal from his conviction, the defendant in *Brandow* contended that the trial court erred in sustaining the prosecutor's objection, thereby depriving the defendant of his right of confrontation. Citing *Smith, supra,* 390 U.S. 129, the court in *Brandow* agreed with the defendant, finding that it was constitutionally impermissible to bar the defendant from ascertaining the witness's actual identity. The court in *Brandow* explained: "Under the circumstances, the credibility of the two opposing witnesses [Dupree and the defendant, himself,] constitutes the fulcrum upon which the determination of the defendant's guilt or innocence must be balanced. We conclude that the identity of the witness was an essential element in the protection of the defendant's right to a fair trial." (*Brandow, supra,* 12 Cal.App.3d 749, 755; accord, *Alford v. Superior Court* (1972) 29 Cal.App.3d 724, 728 [105 Cal.Rptr. 713] [holding that the defendant was entitled to cross-examine a material witness as to his true name]; *People v. Mascarenas* (1971) 21 Cal.App.3d 660, 666 [98 Cal.Rptr. 728] [reversing the trial court's ruling that a material witness need not disclose his address where the trial court found that " 'the witness is in possible danger of harassment, intimidation,

---

questions which tend merely to harass, annoy, or humiliate a witness may go beyond the bounds of proper cross-examination. I would place in the same category those inquiries which tend to endanger the personal safety of the witness. But in these situations, if the question asked is normally permissible, the State or the witness should at the very least come forward with some showing of why the witness must be excused from answering the question. The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling. Here, the State gave no reasons justifying the refusal to answer a quite usual and proper question [concerning the *address* of a witness]. For this reason, I join the Court's judgment . . . ." (*Smith, supra,* 390 U.S. 129, 133-134 [88 S.Ct. 748, 751] (conc. opn. of White, J.).)

humiliation, if not personal safety' "]; cf. *People v. Benjamin* (1975) 52 Cal.App.3d 63, 73-75 [124 Cal.Rptr. 799] [upholding the trial court's order precluding inquiry on cross-examination regarding the home addresses of four prosecution witnesses, in a case involving numerous eyewitnesses and the presence of circumstantial evidence implicating the defendant]; *People v. Patejdl* (1973) 35 Cal.App.3d 936, 940-944 [111 Cal.Rptr. 191] [upholding the trial court's order denying the defendant's motion to discover an informant's address in view of the danger to the witness's personal safety, where there was no substantial conflict between the testimony of the defendant and that of the informant on the issues determinative of guilt].)

### C.

The People urge us to consider several state and federal judicial decisions that assertedly embrace the proposition that a defendant's right of confrontation properly may be balanced against the need to protect a witness's safety. The People contend that under such a balancing process, when the risk posed to a witness's safety is grave enough, a defendant's right to be informed of the identity of the witness properly may give way even if the witness's testimony is crucial to the prosecution's case. The Court of Appeal majority endorsed this position.

In observing that *Alford, supra,* 282 U.S. 687, and *Smith, supra,* 390 U.S. 129, do not establish an inflexible rule requiring disclosure of a witness's identity and address in all circumstances, however, the overwhelming majority of the decisions cited by the People and the Court of Appeal—unlike the case presently before us—involved factual situations in which the *only* information withheld from the defense was the residential *address* of the witness or other identifying information deemed to be *inconsequential* to the defendant's right to a fair trial under the facts presented. (See, e.g., *Montez v. Superior Court* (1992) 5 Cal.App.4th 763, 771 [7 Cal.Rptr.2d 76] [where four eyewitnesses to a murder committed during the robbery of a restaurant all were employees of the restaurant, the court upheld nondisclosure of the witnesses' addresses because "the facts raise no issue of their reputation in their community for veracity"]; *People v. Watson* (1983) 146 Cal.App.3d 12, 20 [193 Cal.Rptr. 849] [in permitting nondisclosure of the prosecution witness's address, the court found that the defendant "was not deprived of a substantial right," because he already had presented "ample evidence . . . to place the witness . . . in his proper setting and accurately to evaluate his credibility"]; *People v. Castro* (1979) 99 Cal.App.3d 191, 200-204 [160 Cal.Rptr. 156] [defense sought the address of the prosecution's witness for the purpose of impeachment, but because the witness already had been impeached as a drug addict, felon, and cheat, the court found that the defense

had presented "sufficient environmental background" to allow the jury to judge the witness's credibility].)[10]

---

[10]Numerous decisions handed down in the federal courts similarly have held that where the identifying information, such as a witness's true name and address, was deemed to be inconsequential to material issues to be contested at trial, nondisclosure was permissible on the basis that the lack of such information did not prejudice the defense. (See, e.g., *United States v. Cavallaro* (2d Cir. 1977) 553 F.2d 300, 304 [the government's legitimate concern for the witness's safety justified denying the defendant the correct address of a witness, where the defense failed to state why the information was material]; *United States v. Persico* (2d Cir. 1970) 425 F.2d 1375, 1383-1384 [fear for the witnesses' personal safety justified the trial court's refusal to disclose their correct address and place of employment, where the witnesses were well known to the defense and the defense failed to demonstrate a "particularized need" for the information]; *United States v. Marti* (2d Cir. 1970) 421 F.2d 1263, 1265-1266 [the defendants were not deprived of the rights of confrontation and due process by the court's refusal to order the witness to disclose a residential address, where the prosecutor had offered the address privately to the defense and where the information was not significant to the investigation by the defense or to the witness's testimony at trial]; *United States v. Baker* (2d Cir. 1969) 419 F.2d 83, 87 [a witness who had received threats to his life properly refused to disclose his name and the address of his current employer, where the defendant's need to know such information "was inconsequential"]; *United States v. Bennett* (2d Cir. 1969) 409 F.2d 888, 901 [no reversible error under *Smith* where the witness was not required to disclose a place of employment, and where the defense had failed to show a particularized need for the information]; *United States v. Jordan* (4th Cir. 1972) 466 F.2d 99, 101-102 [upholding nondisclosure of the names of two eyewitnesses to a jailhouse knife attack, where the victim identified the defendant and provided testimony that "was itself enough to sustain the conviction even if" the other witnesses had been discredited, and where the testimony of prison guards thoroughly discredited the defendant's alibi]; *United States v. Hughes* (5th Cir. 1981) 658 F.2d 317, 321-322 [trial court's ruling prohibiting disclosure of a hostile defense witness's address did not amount to plain error, where "no advantageous purpose" was to be gained by disclosure]; *United States v. Contreras* (5th Cir. 1979) 602 F.2d 1237, 1239-1240 [the reasonable concern for a Drug Enforcement Administration agent's safety justified the trial court's refusal to require disclosure of his home address, where the defendant "had ample opportunity to place the witness in his proper setting," and nondisclosure of the agent's home address "could not have prejudiced defendant"]; *United States v. Avalos* (5th Cir.1976) 541 F.2d 1100, 1117 [observing "that the Supreme Court . . . had established no hard and fast rule regarding questions about [current] addresses," and the defendants had failed to show prejudice from the nondisclosure of such information involving two government witnesses who had been placed in a witness protection program]; *United States v. Crockett* (5th Cir. 1975) 506 F.2d 759, 762-763 [the government's strong basis for believing that its witnesses' lives were in danger justified the trial court's order permitting nondisclosure of their residential addresses, and the defendants demonstrated no prejudice]; *United States v. Alston* (5th Cir. 1972) 460 F.2d 48, 50-54[a federal narcotics agent was not required to disclose his home address where reasonable fear concerning safety of the witness and his family existed, and nondisclosure was not prejudicial]; *U.S. v. Olson* (7th Cir. 1992) 978 F.2d 1472, 1476-1477 [trial court's failure to order disclosure of an informant's address did not deny the defendant his rights of due process and confrontation, in view of the circumstance that the defense had ample impeachment evidence and the value of the sought-after information was minimal]; *United States ex rel. v. Twomey* (7th Cir. 1972) 460 F.2d 400, 402-403 [upholding nondisclosure of the identity of a paid government informant who had a drug habit, in part because the defense already had adduced such impeachment and the witness "was not a principal prosecution witness," and noting that nondisclosure is permissible only "where the informant

In other cases relied upon by the People, the identity or address of the witness *actually was made available* to defense counsel privately, or was discovered by the defense prior to trial. Thus, nondisclosure was limited to events occurring in open court and did not preclude defense efforts to investigate the witness for the purpose of obtaining material that might be useful in cross-examination. Therefore, these cases, too, are distinguishable from the case presently before us. (See, e.g., *People v. Ramirez* (1997) 55 Cal.App.4th 47, 55 [64 Cal.Rptr.2d 9] [in a sexual assault case involving a victim who was allowed to testify under the pseudonym Jane Doe, "the defense was provided with complete discovery, including the true name and address of the victim"]; see also *Siegfriedt v. Fair* (1st Cir. 1992) 982 F.2d 14, 17 [no violation of the defendant's right of confrontation where the prosecution witness testified under a pseudonym at a probable cause hearing, but the true identity of the witness was known to the defendant prior to trial, allowing the defendant "effectively to investigate and impeach the

is not the principal witness against the accused"]; *U.S. v. Springer* (8th Cir. 1987) 831 F.2d 781, 783 [upholding nondisclosure of information related to the location of the informant's upbringing, where the jury was exposed to an extensive amount of evidence regarding the informant's background]; *United States v. Spector* (8th Cir. 1986) 793 F.2d 932, 937-938 [informant not required to disclose correct address in open court, where the prosecutor had offered to provide the information privately to defense counsel, and the defendant failed to demonstrate prejudice from nondisclosure]; *United States v. Washington* (9th Cir. 1986) 797 F.2d 1461, 1474-1475 [concerns about the personal safety of former prostitutes justified the trial court's refusal to order disclosure of their present addresses, where the evidence established that the defendant had beaten prostitutes with various objects]; *United States v. Rangel* (9th Cir. 1976) 534 F.2d 147, 148 [upholding nondisclosure of the identity of a paid government informant in order to maintain the witness's cover, and because the defense did not require the informant's true name in order to uncover facts with which to impeach his testimony effectively]; *United States v. Cosby* (9th Cir. 1974) 500 F.2d 405, 407 [upholding nondisclosure of the government informant's address, where tape recordings of the defendant's incriminating conversations with the informant were introduced]; *United States v. Ellis* (9th Cir. 1972) 468 F.2d 638, 639 [upholding nondisclosure of the government agent's identity on the basis that "[t]he incriminating transaction was observed by police officers, and the relevance of the personal history of the undercover agent was questionable"]; *United States v. Smaldone* (10th Cir. 1973) 484 F.2d 311, 318-319 [the trial court's refusal to allow the defendant to elicit the address of a government informant was not error, where "there was not present the usual necessity to bring out the address" of the witness, and the defendant failed to make a showing as to why he needed such information]; *United States v. Varella* (11th Cir. 1982) 692 F.2d 1352, 1355-1356 [upholding nondisclosure of the identity of each of the government informants who had "minimal" participation in the case and whose testimony "overwhelmingly focused on collateral matters"]; see also *United States v. Mesa* (5th Cir. 1981) 660 F.2d 1070, 1075-1076 [the defendants' right of confrontation was not violated by the court's failure to conduct an in camera hearing before refusing to order disclosure of the witness's address, where information known to the defense gave the defendants "ample opportunity" to identify the witness within his environment]; *United States v. Fife* (6th Cir. 1976) 573 F.2d 369, 376-377 [where the prosecution witness declined at trial to reveal his residential address but on cross-examination revealed the name of the small town in which he resided, "the purpose of *Alford* and *Smith*" ("to identify the witness and locate him in his usual environment") was deemed to have been satisfied].)

declarant"]; *United States v. Dyman* (2d Cir. 1984) 739 F.2d 762, 772-773 [where the defendant failed to object to nondisclosure of the witness's address or explain the need for it, and the address already was known to the defense, the defendant was not prejudiced by the witness's failure at trial to state the address]; *Clark v. Ricketts* (9th Cir. 1991) 958 F.2d 851, 854-855 [the trial court's refusal to allow a government informant to be cross-examined regarding his true name and address was upheld where the prosecution had disclosed the witness's true name to the defendant prior to trial, thereby allowing the defense to investigate the witness]; *U.S. v. Chavez-Vernaza* (9th Cir. 1987) 844 F.2d 1368, 1376-1377 [there exists no right to have the home address of immunized government witnesses stated in court, where the witnesses provided their true names, occupations, and professional backgrounds, as well as their involvement with the defendant, and where the defendant was allowed to obtain the witnesses' addresses outside the presence of the jury].)[11]

Significantly, in all those decisions in which a witness's name or address was deemed crucial, or the prosecution failed to allege a basis for nondisclosure of identifying information, the courts uniformly have concluded that disclosure at trial is required. (See, e.g., *Miller v. Superior Court* (1979) 99

[11]Judicial decisions rendered by our sister state courts and cited by the People similarly are unpersuasive. (See *State v. Novosel* (1980) 120 N.H. 176 [412 A.2d 739] [upholding nondisclosure of witness's new, out-of-state address, where the witness was the defendant's father-in-law and the crime was committed at the father-in-law's former residence]; *Marshall v. State* (Fla. 1992) 604 So.2d 799 [upholding nondisclosure at trial of the identity of a witness to a jailhouse murder, to protect the witness against possible retaliation from other inmates, where the witness's identity was disclosed to the defendant prior to trial].)

Our own survey of the relevant decisions rendered by our sister state courts has failed to locate a single case upholding nondisclosure at trial of the identity of a crucial prosecution witness. (See *State v. Baumann* (1980) 125 Ariz. 404, 410-411 [610 P.2d 38, 44-45]; *People ex rel. Dunbar v. District Ct. of Seventh J.D.* (1972) 177 Colo. 429 [494 P.2d 841, 843]; *State v. Hassberger* (Fla.1977) 350 So.2d 1, 5; *Timberlake v. State* (1980) 246 Ga. 488 [271 S.E.2d 792, 800-801]; *People v. Manzella* (1973) 56 Ill.2d 187 [306 N.E.2d 16, 19-20], disapproved on another point in *People v. Huckstead* (1982) 91 Ill.2d 536 [65 Ill.Dec. 232, 237, 440 N.E.2d 1248, 1253]; *People v. Jones* (1987) 155 Ill.App.3d 641 [108 Ill.Dec. 196, 201-202, 508 N.E.2d 357, 362-363]; *Crull v. State* (Ind. 1989) 540 N.E.2d 1195, 1198-1200; *Johnson v. State* (Ind. 1988) 518 N.E.2d 1073, 1065-1076; *State v. Sheffey* (Iowa 1977) 250 N.W.2d 51, 55; *State v. Hutchinson* (1977) 222 Kan. 365 [564 P.2d 545, 548]; *State v. Thornton* (La. 1975) 309 So.2d 266, 266-268 [85 A.L.R.3d 533]; *Commonwealth v. McGrath* (1973) 364 Mass. 243 [303 N.E.2d 108, 113-114]; *People v. Pleasant* (1976) 69 Mich.App. 322 [244 N.W.2d 464, 466]; *State v. Caldwell* (1975) 303 Minn. 297 [227 N.W.2d 382, 386]; *State v. Glass* (Mo.Ct.App. 1977) 554 S.W.2d 426, 428; *Greene v. State* (1980) 96 Nev. 555 [612 P.2d 686, 687-688]; *State v. Vandebogart* (1994) 139 N.H. 145 [652 A.2d 671, 681]; *People v. Stanard* (1977) 42 N.Y.2d 74 [396 N.Y.S.2d 825, 830-832, 365 N.E.2d 857, 861-864]; *State v. McNeil* (1990) 99 N.C.App. 235 [393 S.E.2d 123, 128-129]; *State v. Capone* (1975) 115 R.I. 426 [347 A.2d 615, 621-622]; *State v. Grooms* (S.D. 1993) 504 N.W.2d 111, 112-115; *Winkle v. State* (Tex.Ct.App. 1972) 488 S.W.2d 798, 799-800; *State v. Berard* (1974) 132 Vt. 138 [315 A.2d 501, 507-509]; *State v. Mannhalt* (1992) 68 Wash.App. 757 [845 P.2d 1023, 1027-1028].)

Cal.App.3d 381, 386 [159 Cal.Rptr. 456] [in a case involving "a single informant witness whose credibility was central to the defense," the defendant was deprived of his right of cross-examination by the withholding of the witness's address]; *United States v. Hernandez* (9th Cir. 1979) 608 F.2d 741, 744-746 [where the principal prosecution witness participated in the events that were critical to the prosecution's case, the identity of the witness could not lawfully be withheld from the defendants, but there was no reversible error in permitting the witness to withhold his address prior to disclosure on cross-examination at trial]; see also *United States v. Fischel* (5th Cir. 1982) 686 F.2d 1082, 1092-1094 [where the government failed to allege any reason for withholding an informant's address from the defendant, the address should have been disclosed]; *United States v. Palermo* (7th Cir. 1969) 410 F.2d 468, 472 [even if the trial court concludes for reasons related to the safety of the witness that the defendant does not have a right to be provided with the witness's address and place of employment, "[u]nder almost all circumstances, the true name of the witness must be disclosed"]; *United States v. Fuentes* (E.D.Pa. 1997) 988 F.Supp. 861 [holding that the prosecution could not withhold the identity of its principal witness from the defense, notwithstanding the circumstance that disclosure would place the witness and his family in danger].)

In short, although the People correctly assert that the confrontation clause does not establish an *absolute* rule that a witness's true identity always must be disclosed, *in every case in which the testimony of a witness has been found crucial to the prosecution's case the courts have determined that it is improper at trial to withhold information (for example, the name or address of the witness) essential to the defendant's ability to conduct an effective cross-examination.* (Accord, *Roviaro v. United States, supra,* 353 U.S. 53 [when an informant is a material witness on the issue of guilt, the prosecution must disclose his or her identity or incur a dismissal]; *Eleazer v. Superior Court* (1970) 1 Cal.3d 847, 851-853 [83 Cal.Rptr. 586, 464 P.2d 42] [when an informant is a material witness to the crime of which the defendant is accused, the prosecution must disclose the informant's name and whereabouts]; *People v. Garcia* (1967) 67 Cal.2d 830 [64 Cal.Rptr. 110, 434 P.2d 366] [same].)[12]

In the present case, the defense argues that the witnesses whose identities are at issue clearly are crucial witnesses whose veracity and credibility are

---

[12]The People also urge us to find persuasive the concurring opinion of Justice White in *Smith, supra,* 390 U.S. 129, 133-134 [88 S.Ct. 748, 750-751]. (See fn. 9, *ante.*) As noted, Justice White suggested that under proper circumstances such as a threat to the personal safety of a witness (an issue not addressed in *Smith*), the witness might be excused from answering questions that "tend to endanger the personal safety of the witness" without violating the defendant's right of confrontation. (*Smith, supra,* 390 U.S. at pp. 133-134 [88 S.Ct. at pp. 750-751]; see also Brennan, *The Criminal Prosecution: Sporting Event or Quest for Truth* (1963) 3 Wash. U. L.Q. 279, 292-295 ["In the rare case, the denial of all discovery

likely to be central to the prosecution's case. As noted, the witnesses' grand jury testimony suggests they were in close proximity to the murder and witnessed events related to the charged offenses. Thus, under the cases discussed above, should the witnesses provide such crucial testimony at trial, the confrontation clause would prohibit the prosecution from relying upon this testimony while refusing to disclose the identities of the witnesses under circumstances in which such nondisclosure would significantly impair the defense's ability to investigate or effectively cross-examine them.

## D.

The People contend that, although they have not identified the witnesses in question by their true names, the impact of such nondisclosure has been mitigated by the prosecution's submission of other relevant information to the defense, including the module, row, and cell number occupied by each of the witnesses at the time of the crime as well as the witnesses' criminal histories. (See *People v. Marshall* (1996) 13 Cal.4th 799, 842 [55 Cal.Rptr.2d 347, 919 P.2d 1280] [a witness's credibility may be impeached extensively with evidence of his or her prior criminal history and involvement in other crimes, and of the inducements for the witness's testimony].) The People maintain that, in view of the disclosures made to the defense, the witnesses can be placed in their proper setting—i.e., as jail inmates—and that further disclosures are unnecessary.

In response, defendants contend that the limited information provided to them is inadequate to permit effective cross-examination. Defense counsel

---

may be compelled to protect the safety of witnesses or prevent apparent perversion of the judicial process."].) Justice White's concurring opinion in *Smith* did not suggest, however, that the testimony of a crucial witness could be admitted while withholding his or her identity, when nondisclosure of the witness's identity would significantly impair the defendant's ability to investigate and cross-examine the witness. (See also *Siegfriedt v. Fair, supra,* 982 F.2d 14, 17-18 ["[T]he *Smith* standard has a core purpose: to prevent a criminal conviction based on the testimony of a witness who remains 'a mere shadow' in the defendant's mind. [Citation.] When that core purpose is not implicated, we see no reason for reflexively excluding otherwise admissible testimony . . . . [¶] . . . Sometimes, as in *Smith* itself, a witness' use of a fictitious name will transform him into a wraith and thereby thwart the efficacy of cross-examination. Other times, the use of a fictitious name will be no more than a mere curiosity, possessing no constitutional significance." (Fn. omitted.)]; accord, *Clark v. Ricketts, supra,* 958 F.2d 851, 854-855; *United States v. Ellis, supra,* 468 F.2d 638, 639; *United States v. Palermo, supra,* 410 F.2d 468, 472; *United States v. Twoomey, supra,* 400 F.2d 400, 401; *State v. Florez* (1994) 134 N.J. 570 [636 A.2d 1040] ["informant's privilege" protecting the identity of a certain witness must yield when the informer is an essential witness on a basic issue in the case]; cf. *Delaware v. Van Arsdall, supra,* 475 U.S. 673, 679 [106 S.Ct. 1431, 1435] [cross-examination of the witness always is subject to a trial judge's broad discretion to impose reasonable limits on interrogation "based upon concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"].)

insist that without access to the witnesses' identities, they will be unable to determine whether the witnesses (1) were present at the time and place of the killing, (2) harbored grudges against either or both defendants, (3) had a motive to kill the victim themselves and accuse defendants in order to dispel suspicion from themselves, (4) made inconsistent statements to others regarding relevant aspects of the case, and (5) had reputations for dishonesty.

We already have explained that the order presently on review, insofar as it relates to *pretrial* discovery, represents a reasonable exercise of discretion under section 1054.7 and a "conscientious effort" (*People v. Lopez, supra,* 60 Cal.2d at p. 247) to balance the defense's need for information before trial against the realistic danger to the witnesses inherent in premature disclosure. At *trial,* however, the confrontation clause imposes greater demands upon the prosecution in that defendants must be afforded an adequate opportunity to confront and cross-examine effectively the witnesses who testify against them. As we have seen, even the Court of Appeal majority opined that without knowledge of the witnesses' identities, defense counsel "will have difficulty obtaining complete information about the witnesses' location and ability to observe and testify about the crime[,] . . . [and] will be unable to [obtain] complete impeaching information, such as the witnesses' reputation for truthfulness or dishonesty, previous history and accuracy of providing information to law enforcement, and other motives to fabricate, such as revenge or reduction or dismissal of their own charges." Indeed, without access to either the witnesses' names or their photographs, defense counsel are unlikely to be able to conduct an adequate investigation of the witnesses or of the veracity of their testimony, or challenge the accuracy of the information concerning the witnesses provided by the prosecution, including their prior criminal records or the benefits that may have been provided to them in return for their testimony.

The People further contend that once the crucial witnesses appear in court at trial, defendants "can advise their attorneys of any prior contacts with these witnesses and any other information they might have concerning these witnesses," and that at that point defendants may be able to obtain a continuance in order to investigate the witnesses. The trial court's order in this case, however, is based upon the premise that the witnesses' identities need not be disclosed at trial under any circumstances. ██ ██ We do not believe such an order can be defended, without full consideration—in light of the relevant evidence and circumstances—of the defense's need for

affirmative disclosure, solely on the assumption that the witnesses' appearance at trial in any event will reveal their identities.[13]

Accordingly, we conclude that the trial court erred in ruling, on the record before it, that the witnesses in question may testify anonymously at trial.[14]

As emphasized at the outset of this opinion, we are keenly aware of the serious nature and magnitude of the problem of witness intimidation.[15] Further, we agree that the state's ability to afford protection to witnesses

---

[13]Although they did not raise the issue in the trial court, the People now contend that even if the trial court's order authorizing permanent nondisclosure otherwise would be impermissible, defendants, by threatening certain witnesses, waived any constitutional right to obtain disclosure of the witnesses' identities. For a variety of reasons, we believe this claim lacks merit.

First, there is no evidence in the record that links defendant Lopez to any threats, and thus even under the People's theory there is no basis for finding a waiver on his behalf.

Second, although evidence was introduced at the in camera hearing, from which the defense was excluded, indicating that defendant Alvarado personally had threatened a witness, Alvarado had no opportunity to contest the evidence or litigate the issue, because the People did not otherwise raise the waiver theory in the trial court. All of the cases upon which the People rely in support of their waiver theory hold that a valid waiver cannot be found absent a full hearing on the point in question. (See, e.g., *United States v. Thai* (2d Cir. 1994) 29 F.3d 785, 814.)

Third, and finally, the trial court's finding that the safety of the witnesses would be endangered by disclosure of their identities was based upon the premise that the danger to the witnesses was posed by the Mexican Mafia, *not* by the individual defendants in this case. Under this circumstance, we do not believe that the denial of disclosure can be sustained on a waiver theory.

[14]In so concluding, we should not be understood as precluding the trial court, as this case proceeds, from reassessing any question with regard to disclosure of the identities of these witnesses. Much may have happened in the considerable time that has elapsed since the trial court's order, or may happen between now and the time of trial, that may affect the necessity for a disclosure order. For example, the prosecution may choose not to present one or more of the witnesses, the witnesses may be unavailable, or the witnesses may choose voluntarily to disclose their names to defense counsel at a pretrial interview.

[15]At oral argument, the People pointed out that during the past five years in Los Angeles County alone, the prosecution has filed special circumstance allegations stemming from the murder of witnesses in 25 cases, is investigating 1,600 cases of witness intimidation, and "can't get witnesses to come forward in over 1,000 gang murders. Why? Because we cannot protect them [the witnesses]."

The use of violence and intimidation by criminal gangs to immunize themselves from the criminal justice system is by no means a recent phenomenon. (See, e.g., Invasions of Privacy: Hearings Before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong. 1st Sess., pt. 3, at p. 1157 (1965) [testimony of former United States Attorney General Nicholas Katzenbach regarding acts perpetrated by organized crime].) For example, the Mexican Mafia, referenced throughout the findings made by the trial court in support of its nondisclosure order (*ante*, at pp. 1128-1129), has been described as one of the oldest prison gangs in the United States, dating back to 1957. (Lyman,

whose testimony is crucial to the conduct of criminal proceedings is an absolutely essential element of the criminal justice system. As we have explained, a trial court has broad discretion to postpone disclosure of a prospective witness's identity in order to protect his or her safety, and may restrict such pretrial disclosure to defense counsel (and ancillary personnel) alone.

A trial court also retains broad discretion to control courtroom proceedings in a manner directed toward promoting the safety of witnesses. (See, e.g., § 868.7, subd. (a)(2) [upon motion of the prosecutor, a magistrate may close the examination of a witness "[w]hose life would be subject to a substantial risk in appearing before the general public"]; see also § 686.2 [authorizing the trial court to remove any spectator who is intimidating a witness]; § 867 [authorizing the magistrate to exclude potential and actual witnesses upon motion of either party]; § 868 [authorizing the magistrate to exclude the public upon the request of the defendant and a finding by the magistrate "that exclusion of the public is necessary in order to protect the defendant's right to a fair and impartial trial"]; *People v. Woodward* (1992) 4 Cal.4th 376, 382-386 [14 Cal.Rptr.2d 434, 841 P.2d 954] [upholding the temporary closure of the courtroom to additional spectators during a murder trial, in view of the "unusual security risks" posed by the trial]; *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1222, fn. 46 [86 Cal.Rptr.2d 778, 980 P.2d 337] [noting that among the "overriding interests" that may justify closure of a courtroom in an appropriate instance is the protection of witnesses from intimidation].)

The state retains numerous other means of affording protection to a potential witness, including the provision of protective surveillance and

Gangland: Drug Trafficking by Organized Criminals (1989) p. 53.) It is believed to exist in several states, with its membership estimated to be about 600 members. (*Id.*, at p. 54.) In California, the Mexican Mafia has been characterized as "a highly organized, well structured, and rather sophisticated organization . . . ." (U.S. Dept. of Justice, Off. of Legal Policy, Prison Gangs, Their Extent, Nature and Impact on Prisons (1985) p. 97.) It relies upon "violent tactics to conduct business" (*ibid.*); "one requirement for membership is for prospects to murder without question." (Lyman, *supra*, at p. 54; see also Rohrlich & Tulsky, *Gang Killings Exceed 40% of L.A. Slayings: Intimidation of Witnesses Allows Hundreds of Suspects to Walk Free. Prosecutors Try to Break the Cycle*, L.A. Times (Dec. 5, 1996) p. A1, col. 4 ["More than a thousand gang killers are walking the streets of Los Angeles. [¶] Witness intimidation helps keep them there. . . . [¶] More and more gang killers—responsible for about 40% of Los Angeles County's murders—remain free."]; Corwin, *Grief Galvanizes Mothers to Seek Crime Witness Aid*, L.A. Times (Oct. 19, 1997) pp. B1, col. 2, B8, cols. 1-4 [observing that gang-related murders often remain unsolved because the witnesses are afraid to come forward].)

The court's decision in the present case is limited to addressing defendants' legal claims regarding the propriety of the trial court's nondisclosure order. We recognize that our decision cannot and will not alleviate the serious problem of witness intimidation.

housing, relocation, documents to establish a new identity, and the transfer of an incarcerated witness to another prison, either within or outside of California. (See, e.g., §§ 14020 et seq. [establishing state Witness Protection Program and authorizing reimbursement to local entities for witness protection expenses], 11189 et seq. [adopting Interstate Corrections Compact authorizing confinement of inmates in other states].)[16] Although none of the measures specifically authorized by these legislative enactments can guarantee the safety of a witness, they do provide mechanisms by which the state can help reduce the risks that he or she faces. Furthermore, the state vigorously may enforce the numerous stringent criminal sanctions that are available against witness harassment and intimidation. (See, e.g., §§ 136 et seq. [establishing a variety of witness intimidation offenses], 190.2, subd. (a)(10) [authorizing the death penalty for the murder of a witness to a crime "who was intentionally killed for the purpose of preventing his or her testimony in a criminal or juvenile proceeding"]; *People v. Jones* (1996) 13 Cal.4th 535, 550 [54 Cal.Rptr.2d 42, 917 P.2d 1165] [holding that the witness-killing special circumstance applies to the killing of any witness who might testify in a criminal proceeding]; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 1018 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [rejecting the argument that the witness-murder special circumstance is inapplicable where "the victim was not an important witness in the criminal proceeding"].)

As has been established by the judicial decisions that we have discussed above, however, the state's legitimate interest in protecting individuals who, by chance or otherwise, happen to become witnesses to a criminal offense cannot justify depriving the defendant of a fair trial. Thus, when nondisclosure of the identity of a crucial witness will preclude effective investigation and cross-examination of that witness, the confrontation clause does not permit the prosecution to rely upon the testimony of that witness at trial while refusing to disclose his or her identity. As this court observed more than 40 years ago, "however praiseworthy was the prosecution's motive in protecting the [witness] from the threat of reprisal[,] [s]uch motives and purposes cannot prevail when, as here, they inevitably result, intentionally or unintentionally, in depriving the defendant of a fair trial." (*People v. Kiihoa* (1960) 53 Cal.2d 748, 754 [3 Cal.Rptr. 1, 349 P.2d 673].)

## V.

As we have explained, the serious threat to the witnesses' safety disclosed by the evidence presented by the prosecution in this case clearly justified

---

[16]Defendant Lopez requests that this court take judicial notice of the November 1999 California State Audit of the California Witness Protection Program. That document is subject to judicial notice under Evidence Code section 452, subdivision (c), and we grant his request. (Evid. Code, § 459.)

delaying disclosure of the witnesses' identities to the defense, but the trial court's order went beyond constitutional bounds in determining that, notwithstanding the significant impairment of defendants' ability to investigate or cross-examine the witnesses or the apparently crucial nature of the witnesses' proposed testimony, the prosecution could withhold the identities of "witnesses 1, 2, and 3" from the defense for the duration of the proceedings and have them testify anonymously at trial. Accordingly, we reverse the judgment of the Court of Appeal insofar as it upholds this aspect of the trial court's order.

We conclude that the trial court should be directed to vacate the challenged order and, because that order was entered some time ago and a variety of circumstances—including the location and situation of the witnesses—may have changed materially in the interim, the trial court should be permitted to fashion a revised order in light of the conclusions expressed in this opinion.

## VI.

For the reasons set forth above, we reverse the judgment of the Court of Appeal and remand the matter to that court with instructions to issue a writ directing the trial court to vacate the challenged order, and to conduct further proceedings and issue a new order consistent with the reasoning set forth in this opinion.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

The petition of real party in interest for a rehearing was denied November 15, 2000, and the opinion was modified to read as printed above.