Filed 5/5/14  P. v. Bustos CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B245088 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA071862) |
| v. | |
| FEDERICO BUSTOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Federico Bustos appeals from the judgment of conviction entered after a jury trial. The jury found Bustos guilty of the first degree murder of Victor Tapia (Pen. Code, § 187, subd. (a)[1]; count 1), committed while engaged in the commission of a robbery and kidnapping (§ 190.2, subd. (a)(17)); the willful, deliberate, and premeditated attempted murder of Alejandro Hernandez (§§ 187, subd. (a), 664; count 2) during which Bustos personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (c) & (d)), and personally inflicted great bodily injury (§ 12022.7, subd. (a)); and assault with a semiautomatic firearm upon Hernandez (§ 245, subd. (b); count 3) during which Bustos personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)).

The jury acquitted Bustos of two counts of kidnapping to commit another crime (§ 209, subd. (b)(1); counts 4 & 5) but found him guilty of the lesser included offense of kidnapping (§ 207, subd. (a)). With respect to the kidnapping of Tapia (count 4), the jury found true the allegations that Bustos personally used a firearm (§ 12022.53, subd. (b)) and personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), but found not true the allegation that Bustos personally and intentionally discharged a firearm that caused great bodily injury or death to Tapia. With respect to the kidnapping of Hernandez, the jury found true the allegations that Bustos personally used a firearm (§ 12022.53, subd. (b)), personally and intentional discharged a firearm (§ 12022.53, subd. (c)), and caused great bodily injury or death to Hernandez in doing so (§ 12022.53, subd. (d)).

---

[1]    All further statutory references are to the Penal Code, unless otherwise noted.

The jury also found Bustos guilty of carjacking (§ 215, subd. (a); count 6) and robbery (§ 211; count 8[2]) and found true the allegations that during the commission of these crimes Bustos personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally inflicted great bodily injury on Hernandez (§ 12022.7, subd. (a)), but found not true the allegation that Bustos personally and intentionally discharged a firearm causing great bodily injury or death to Tapia and Hernandez (§ 12022.53, subd. (d)).

On count 1 the trial court sentenced Bustos to state prison for life without the possibility of parole. On count 2 the court imposed a consecutive term of life with the possibility of parole, plus 25 years to life pursuant to section 12022.53, subdivision (d). Pursuant to section 654 the court stayed the sentences it imposed on counts 3, 4, 5, 6, and 8.

Bustos contends (1) the trial court's exclusion of evidence that Tapia was a drug dealer with a pending case against him and that his autopsy revealed methamphetamine in his system violated his rights to cross-examine witnesses against him and to present a defense; (2) the death penalty violates the Eighth Amendment because the proliferation of special circumstances has undermined the narrowing function required by California law; and (3) his sentence constitutes cruel and unusual punishment. Finding no merit to any of these contentions, we affirm the judgment.

## FACTS

A.    *The Day Before the Crimes*

Around 5:00 p.m. on Sunday, April 2, 2006, Hernandez, who then lived in Van Nuys with his father, went to his friend Tapia's house. Hernandez had known Tapia for three years. Hernandez left about an hour later after consuming two or three 12-ounce

---

[2]    The information did not contain a count 7.

beers and went to the house of his best friend, Ruben Estrada, arriving around 6:10 p.m. While at Estrada's house, Hernandez assisted with a barbecue and drank more beer. Sometime before 8:00 p.m. Hernandez either was going to or coming from his car alone when he encountered an individual known as Chupacabra. Chupacabra, whom Hernandez had known for about a year, gave Hernandez some methamphetamine, which he cut into four lines and snorted. Hernandez then returned to Estrada's house where he stayed until 10:00 or 11:00 p.m and consumed about ten, 12-ounce beers. Hernandez returned to his home and went to bed, but because he had taken methamphetamine he was unable to sleep.

B.     *The Crimes*

Hernandez, who worked full time as a machinist, called in sick on Monday, April 3, 2006 because he had a hangover and had been unable to sleep. He drank two, 24-ounce beers and felt a little better.

At 7:00 or 8:00 a.m. Tapia called Hernandez and asked Hernandez to drive him to Riverside so he could collect some money from his cousin. Tapia did not say how much money his cousin owed him or why his cousin owed him the money, and Hernandez did not ask. Although Tapia had a car, he asked Hernandez to drive him because he believed that if the police pulled him over in Riverside County they would ask him about his legal status. Hernandez did not think Tapia had a driver's license and believed he was not legally in the United States. Hernandez agreed to drive Tapia, who in turn said he would pay Hernandez $100.

Hernandez picked up Tapia, who lived three or four minutes away. As they drove to Riverside, Estrada called Hernandez multiple times. Hernandez answered 10 to 15 of Estrada's calls, and then turned his phone to silent.[3] After driving for two hours and

---

**3**     According to Hernandez, Estrada had been unemployed for a year. It was not unusual for Hernandez to receive multiple telephone calls from Estrada throughout the day. Estrada even called Hernandez when he was at work.

4

realizing they were lost, Hernandez pulled into a liquor store and parked. Tapia used his cell phone to call his cousin and then walked into the store. Tapia returned to Hernandez's car where the two men waited for Tapia's cousin to arrive.

About 20 minutes later, a maroon Honda Accord with three Hispanic males pulled up along the right side of Hernandez's car. Hernandez had never seen any of the three men before. The man in the back seat of the Honda got out of the car and said "Hi" to Tapia. Tapia, in turn, said, "Hi Primo," which means cousin in Spanish. Primo got into the back seat of Hernandez's car and starting giving Hernandez directions. Hernandez followed and later passed the Honda. Tapia and Primo had "a friendly conversation" as if they had not seen each other for a while. It appeared to Hernandez that Tapia and Primo knew each other well.

Hernandez continued to drive when he heard the sound of a gun being cocked. Hernandez was "shocked" and turned around to see Primo pointing a semi-automatic gun at him. Tapia was surprised as well. Primo directed Hernandez to stop, and Hernandez pulled over to the curb. Tapia asked Primo, "What are you doing? Are you crazy?" At Primo's direction, Tapia moved from the front passenger seat to the rear seat behind Hernandez. Hernandez, who was "scared," looked into the rearview mirror and saw Primo covering Tapia's eyes and mouth with gray duct tape. Hernandez did not see Primo tape the other parts of Tapia's body but he did hear Primo unrolling tape.

After he finished taping Tapia, Primo told Hernandez to get out of the car. Hernandez complied, leaving his keys in the ignition. Once outside Hernandez saw the Honda about three feet away. Bustos and another individual were inside the Honda. Primo, who also got out of Hernandez's car, told Hernandez to get in the back. Hernandez got into the passenger side rear seat. Primo got into the driver's seat of Hernandez's car and Bustos got into the front passenger seat. Bustos turned around and told Hernandez to put his hands behind his back. Hernandez complied and put his hands behind his back so that Bustos could tape them. Bustos then told Hernandez to put his feet up. Hernandez again complied, and Bustos taped his ankles. Finally, Bustos taped

5

Hernandez's mouth and eyes.[4]  The car then began moving.  Hernandez could hear Primo and Bustos whispering.

About 20 minutes later, the car stopped.  Tapia and Hernandez were taken out of the car.  Hernandez was placed face down on what felt like cold cement.  Hernandez heard Tapia mumbling a few feet away.  Someone frisked Hernandez and removed $300 and a cell phone from his pockets.  Hernandez overheard Bustos telling the other men that the sound system in Hernandez's car was "nice."[5]  Hernandez heard his trunk open and also heard dismantling sounds.  During this time Hernandez heard a male voice he had not heard before.  When Hernandez complained that his arms hurt, someone cut the tape around his wrists and re-taped his wrists in the front of him.  After about an hour later, Hernandez was picked up and told to get in the car.  Because he could not walk, someone cut the tape around his ankles.  Hernandez got back into what he believed was his car and someone shut his door.  He also heard someone get into the car and sit next to him and the door close.  He then heard two more doors shut.  Tape still covered Hernandez's eyes, and he could not see anything.

The car then started moving again at a fast speed for about two hours as if they were traveling on the freeway.  During the ride Hernandez was hot and started sweating.  As a result the tape around eyes became loose on the bottom.  He tilted his head back and was able to see a male Hispanic in the driver's seat, who looked like the third individual he had seen in the Honda earlier.  Hernandez could not see the front passenger's face but was able to see that he was wearing a gray baseball cap.  The cap appeared to be the same one he saw Bustos wearing earlier.  Hernandez also recognized Bustos' voice as the voice of the person who had given him instructions and taped him up.  Hernandez was also able to confirm that he was in his car.

---

[4]  Bustos placed the tape over Hernandez's eyes but not around his head.

[5]  Hernandez's car was equipped with a seven-inch front dash monitor, an equalizer, XM satellite radio, a DVD player, and two headrest monitors.  He also had two amplifiers and a big speaker box in the trunk.  He valued his equipment at $3,500 to $4,000.

After about two hours, Hernandez noticed that the road had become "bumpy." The car hit a pothole or something and then stopped. Unbeknownst to Hernandez, the men had driven him and Tapia to an isolated area of Sierra Madre. Hernandez heard the two men in the front talking, followed by the sound of "a walkie-talkie type of a thing." Hernandez then heard someone say, "It's clear." He then heard the front doors open and "two guns cock," followed by shooting. A bullet struck Hernandez under his nose, and he lost consciousness.

Hernandez later regained consciousness but had no idea how much time had passed. When he removed the tape from his eyes, he saw Tapia "slumped over" with blood on his head. Tapia was not moving or making any sounds. Hernandez told Tapia that he was going to get help and that he would be back. Hernandez managed to unlock and open the car door. Outside he saw a hill, a mountain, and a dirt road. No one was around. Hernandez started down the hill and removed the tape from his mouth. It was getting dark when he encountered a group of men and screamed for help. Someone called for help, and an ambulance arrived and took him to the hospital.

Hernandez had two surgeries and remained in the hospital for three weeks. Hernandez was shot between his nose and upper lip, in the chin, neck, finger, and left arm, and sustained lasting injuries. Tapia died from two gunshots to the head, each of which was independently fatal. One bullet went completely through his head; the medical examiner removed the other bullet from his head.

C.      *The Investigation of the Crimes*

Law enforcement personnel found inside Hernandez's car five containers containing a white powdery substance resembling a controlled substance in a dark plastic bag. Each container was wrapped with duct tape. Hernandez did not recognize the containers and had no idea why anyone would put them in his car. Hernandez never saw Tapia with the containers. A criminalist subsequently analyzed the contents of the containers and determined that they contained no controlled substances but instead contained "bunk," an innocuous substance made to resemble a controlled substance.

7

While Hernandez was in the hospital, he communicated by writing notes because his jaw had been wired shut. Police found a handwritten note that Hernandez had discarded in the trash can of his hospital room. The note stated, "I don't want the cops to know the truth. What's up? I afraid that they know where I live because I had my license and they had my keys." Hernandez explained that at the time he wrote this note, he was "afraid of saying anything" because he had seen the faces of his assailants. He feared "retaliation because they had my keys to my house and my driver's license, basically all the information they need."

Bustos' fingerprints matched latent fingerprints found on the left rear interior door handle of Hernandez's car. DNA evidence collected from the left rear interior door grip and the front passenger seatbelt in Hernandez's car identified Bustos as a possible contributor. DNA evidence collected from a glove and nail clippers recovered from the car matched Bustos as a "major contributor." Hernandez's blood was found on the glove. A sock found in Hernandez's car contained Tapia's blood and Bustos' DNA. DNA from Tapia and Bustos were also present on duct tape found in the car.

A bullet removed from the headrest of the left rear passenger seat of Hernandez's car where the police found Tapia and a bullet recovered from Tapia's body were both fired from a 9-millimeter Luger caliber pistol. A bullet removed from Hernandez's body, as well as a bullet recovered from the right rear passenger seat of his car where he was sitting, and shell casings recovered from Hernandez's car, matched a pistol recovered from a car driven by Bustos on April 9, 2006 after a Riverside Police Officer attempted to effect a traffic stop. Bustos fled from the scene leaving the pistol on the driver's seat.

More than a year after the shooting, Hernandez identified Bustos in a photographic lineup as the person who entered his car and bound him with duct tape. He was not, however, 100 percent sure of his identification. The police arrested Bustos on December 27, 2007.

**DISCUSSION**

A.  *The Trial Court Did Not Abuse Its Discretion or Violate Bustos'*
    *Constitutional Rights by Excluding Evidence of Tapia's Drug Usage and*
    *Pending Drug Charges*

Bustos contends that the "trial court erred by prohibiting the defense from offering evidence that victim Tapia was a drug dealer with a pending case against him and that methamphetamine was found in his system at the time of the autopsy in violation of [Bustos'] rights to cross-examine the witnesses against him and to present a defense." Bustos has not established a violation of his constitutional rights.


1.  Relevant Background

Bustos' theory of defense was that Hernandez knowingly drove Tapia to Riverside to engage in a methamphetamine drug transaction. They took the drugs, which they had hidden in the speakers in Hernandez's trunk, into an apartment in Riverside, where something went terribly wrong. Individuals other than Bustos taped Hernandez and Tapia inside the apartment and then drove them to Sierra Madre and shot them because of the failed drug deal.

Prior to trial, and in an effort to establish his theory of defense, Bustos filed a motion asking the court to allow him to introduce evidence that Tapia had been arrested and had a pending case against him for sale of methamphetamine. At the hearing on the motion, counsel for Bustos argued that the evidence was relevant "to strengthen the defense position that the crimes alleged against defendant Bustos were committed by persons other than defendant Bustos as the result of a drug deal gone bad" and to impeach Hernandez's credibility as "an admitted friend of" Tapia. When the trial court asked if counsel for Bustos was attempting to establish third-party culpability, counsel said he was not. Counsel suggested, among other things, that Tapia was a drug dealer (based on Hernandez's testimony at the preliminary hearing that Tapia sold drugs from his house), that Hernandez was directly or indirectly involved in the sale of methamphetamine, and

9

that Hernandez was lying when he denied he was involved in drug sales. Counsel for Bustos argued that Hernandez knew he was driving Tapia to Riverside to participate in a drug deal, that Tapia's pending case strengthened Bustos' position, and that the electronic equipment Hernandez installed in his car was the fruit of his drug activities. Finally, counsel for Bustos emphasized that Hernandez, in his preliminary hearing testimony, stated that he had $300 in cash on his person and had received a $600 cell phone bill.

The trial court denied Bustos' motion to admit evidence of Tapia's arrest and pending case for sale of methamphetamine, finding "that there is insufficient probative value . . . in presenting this evidence to the jury for several reasons." First, the court noted, "as defense counsel concedes, the entire argument of presenting this information is based on the fact that the allegation is true. . . . And if the allegation is true then, therefore, all of these things follow including the theory that . . . the killing was actually a drug deal gone bad and, therefore, it was another person who committed this act. So that is the No. 1 reason why this information doesn't have any probative value because we just don't know if it's true." Second, the court stated that if it "were to engage in some type of evidentiary hearing or allowing evidence in as to its truthfulness, then under [Evidence Code section] 352 that would be a huge consumption of time. It would have a trial within a trial and it would also be fundamentally unfair to present evidence against a witness who is not here to defend themselves [*sic*], basically, is what it would be, even though Mr. Tapia is not a witness here in this case." Third, the court noted that "this is not impeachment evidence. Mr. Tapia is not a witness. I think it would be a different circumstance if Mr. Tapia's statement were coming in. I think the court would have to evaluate whether or not prior bad acts would be used as impeachment against a statement by Mr. Tapia. But as it stands right now I don't have any statements by Mr. Tapia that are coming in." The prosecutor confirmed that there would be no such statements by Tapia.

The court also stated that the fact that Hernandez had nice stereo equipment in his car did not logically imply that he had used drug money to purchase the equipment because, as a matter of common knowledge, people spend a lot of money on their cars.

10

With respect to the $600 cell phone bill, the court stated, "I don't find a $600 phone bill excessive. I have two teenage kids and knowing how phones are used and all of the different charges that are put out there now, it's very easy to come up with a $600 phone bill. And all Mr. Hernandez has to do is not pay for one month and he is looking at a huge phone bill."

After the trial court denied Bustos' motion, the People made a motion to exclude evidence that Tapia had methamphetamine in his system at the time of his death. The prosecutor argued that the cause of Tapia's death was not an issue and therefore his toxicology results were irrelevant and an impermissible type of character evidence. Counsel for Bustos opposed the motion, explaining that he was not seeking to introduce Tapia's toxicology results for the purpose of attacking Tapia's character. Rather, counsel for Bustos sought to introduce such evidence "to strengthen . . . the defense position that the crimes alleged against Federico Bustos were committed by persons other than Mr. Bustos as a result of a drug deal gone bad." Counsel for Bustos argued that Tapia's toxicology results were relevant to prove that Tapia used and sold drugs and "to impeach the credibility of Mr. Hernandez who . . . admitted at [the] preliminary hearing that he uses drugs."

The trial court did not think there was "a close enough nexus for one to say [Tapia] had drugs in his system, therefore, this was a drug deal gone bad." The court therefore excluded Tapia's toxicology results on relevancy grounds. The court further noted that even if the evidence had some limited relevance the court would exclude the evidence pursuant to Evidence Code section 352 because of the undue consumption of time and substantial danger of confusing the jury. "I am going to say this. If there is additional evidence regarding the drug deal, then I will reconsider whether or not that has some relevance. But right now the sort of theory of drug deal gone bad is so tenuous that I don't see how there is a connection."

Despite the trial court's ruling, counsel for Bustos asked Hernandez a series of questions, which Hernandez answered in the negative, designed to convey the defense theory of the case to the jury. Bustos' theory was that on April 2, 2006, the day before

11

the crimes, while at Tapia's residence, Hernandez and Tapia agreed to engage in a drug transaction the following day in Riverside. After drinking beer and ingesting methamphetamine, Hernandez told Estrada about the drug deal that Hernandez and Tapia had planned for the next day. While Hernandez and Tapia were en route to Riverside the following day, Estrada called Hernandez numerous times on his cell phone because Estrada did not want Hernandez to go through with the drug deal. After meeting Tapia at the liquor store, Hernandez and Tapia followed the maroon Honda from the parking lot to an apartment in Riverside. They then removed a quantity of methamphetamine from the speakers in the trunk and took the drugs to the apartment complex. Hernandez and Tapia were duct-taped inside the complex, not on a public street in broad daylight. In addition, Hernandez purchased the stereo and electronics equipment in his car with money he made from selling methamphetamine. Chupacabra, who Hernandez claimed gave him methamphetamine on April 2, 2006, was a figment of his imagination.

### 2. Applicable Law and Analysis

"Of course, only relevant evidence is admissible (Evid.Code, § 350), and relevance is defined as 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action' (*id*., § 210)." (*People v. Jones* (2013) 57 Cal.4th 899, 947.) "This definition includes evidence 'relevant to the credibility of a witness.' [Citation.]" (*People v. Contreras* (2013) 58 Cal.4th 123, 152.) "Conversely, a matter is 'collateral' if it has no logical bearing on any material, disputed issue. [Citation.] A fact may bear on the credibility of a witness and still be collateral to the case. [Citations.]" (*Ibid*.) "The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner [citation]." (*Jones*, *supra*, at p. 947.)

The trial court also has discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of

confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Edwards* (2013) 57 Cal.4th 658, 713; *People v. Maciel* (2013) 57 Cal.4th 482, 527.)  As with relevancy rulings, we review the trial court's rulings under Evidence Code section 352 for an abuse of discretion.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1181; *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 754.)

Here, the trial court acted well within its broad discretion in ruling that the evidence regarding Tapia's pending case for sale of methamphetamine, as well as the evidence that he had methamphetamine in his system at the time of his death, was irrelevant.  This evidence had no tendency in reason to prove that Tapia and Hernandez drove to Riverside for the purpose of engaging in a drug deal, that they were shot because of a "drug deal gone bad," or that Bustos was not one of the shooters.  Any such inferences Bustos may have attempted to draw from such evidence would have been speculative at best and thus irrelevant.  (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1260 [speculative inferences are irrelevant]; *People v. Morrison* (2004) 34 Cal.4th 698, 711 ["[e]vidence is irrelevant . . . if it leads only to speculative inferences"]; *People v. Yeoman* (2003) 31 Cal.4th 93, 141 ["the law does not require the admission of evidence made relevant only by speculative hypothesis"].)

Even if the evidence had some marginal relevance, the trial court also acted well within its broad discretion in excluding the evidence under Evidence Code section 352. The trial court was justified in concluding that whatever limited probative value the evidence might have had was substantially outweighed by the accompanying undue consumption of time, and by the substantial danger of confusing the issues and misleading the jury that conducting a trial on the pending drug charge against Tapia would have created.  (See *People v. Hamilton* (2009) 45 Cal.4th 863, 930 [trial court did not abuse its discretion under Evidence code section 352 by excluding evidence that "would have required 'a mini-trial'" and "was of limited probative value"]; *People v. Brown* (2003) 31 Cal.4th 518, 544-545 [trial court did not abuse its discretion under Evidence Code section 352 by excluding evidence of a prosecution witness' pending charges]; *People v. Jones* (2003) 30 Cal.4th 1084, 1108-1109 [trial court did not abuse its

13

discretion under Evidence Code section 352 by excluding evidence that was "not particularly probative" and "would have required evidence of the details of an otherwise unrelated crime"]; *People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1154 ["the trial court was well within its discretion to prevent a minitrial on [the defendant law enforcement agency's] administrative decisions regarding its Taser policy, when the issue was defendant's conduct at the time he shot" the victim].  The trial court was justifiably concerned that a mini-trial on Tapia's drug charges would have distracted the jurors from the issue in the case of whether Bustos and his accomplices had shot Hernandez and Tapia.

The trial court also acted well within its discretion in excluding evidence of Tapia's toxicology results under Evidence Code section 352.  The trial court properly determined that introduction of evidence showing that Tapia had methamphetamine in his system when he died would also consume too much time and pose a substantial danger of confusing the jury.  The evidence would have invited the jury to speculate about whether Tapia and Hernandez had engaged in criminal activity, which, in any event, would not have been a defense to the execution of Tapia and the attempted execution of Hernandez.

Finally, "not every restriction on a defendant's cross-examination rises to a constitutional violation.  [Citation.]"  (*People v. Singleton* (2010) 182 Cal.App.4th 1, 18.) The right to confront and cross-examine adverse witnesses "is not absolute . . . 'and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'  [Citation.]"  (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1138-1139.) Because the trial court did not abuse its discretion in its evidentiary rulings, there was no violation of Bustos' constitutional right to cross-examine Hernandez and present a defense.  (See *People v. McNeal* (2009) 46 Cal.4th 1183, 1203 ["'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense"'"]; *People v. Cunningham* (2001) 25 Cal.4th 926, 999 ["[a]lthough the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense

evidence on a minor or subsidiary point does not interfere with that constitutional right"].)

B.   *The Trial Court Did Not Impose an Unconstitutional Death Penalty Sentence on Bustos*

"A defendant convicted of first degree murder with at least one special circumstance found true will be sentenced to either death or life imprisonment without the possibility of parole.  [Citation.]  One of these special circumstances is the felony-murder special circumstance . . . ."  (*People v. Estrada* (1995) 11 Cal.4th 568, 571-572; see § 190.2, subd. (a).)  Bustos contends the "California death penalty law violates the Eighth Amendment of the United States Constitution because the proliferation of special circumstances has undermined the narrowing function required of California law."  Because the People did not seek, and Bustos did not receive, the death penalty in this case, Bustos does not have standing to challenge the constitutionality of the death penalty statute.  (See *Bradway v. Cate* (9th Cir. 2009) 588 F.3d 990, 991 [defendant "recognizes that he lacks standing for an Eighth Amendment death penalty challenge because he was not sentenced to death"]; *Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907 ["[t]he government correctly argues that [the defendant] lacks standing to [challenge the death penalty] because he was not sentenced to death"]; see also *In re Perdue* (2013) 221 Cal.App.4th 1070, 1077 ["'"[t]he rule is well established . . . that one will not be heard to attack a statute on . . . grounds that are not shown to be applicable to himself and that a court will not consider . . . the question of constitutionality with reference to hypothetical situations"'"].)

Bustos acknowledges that the People did not seek the death penalty in this case and that the trial court sentenced him to life without the possibility of parole.  He argues, however, that because his sentence "was enhanced by a special-circumstance finding, he is permitted to argue as a matter of statutory construction that the special circumstance violates the Eighth Amendment if applied in a death penalty case, since the construction of the special circumstance in his case must be consistent with its construction in a capital

15

case." To the extent Bustos is making a constitutional challenge to the felony murder special circumstance pursuant to which he received a sentence of life without the possibility of parole, the California Supreme Court has repeatedly rejected such a challenge. (See *People v. Enraca* (2012) 53 Cal.4th 735, 769 ["the felony-murder special circumstance (§ 190.2, subd. (a)(17)) is not overbroad and adequately narrows the pool of those eligible for death"]; *People v. Williams* (2010) 49 Cal.4th 405, 469 [the number of special circumstances in section 190.2 "is not so high as to fail to perform the constitutionally required narrowing function; . . . and the felony-murder special circumstance is not invalid for failing to narrow meaningfully the class of persons eligible for the death penalty"]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1195 ["[t]his court has consistently rejected the claim that the statutory special circumstances, including the felony-murder special circumstance, do not adequately narrow the class of persons subject to the death penalty"].)

### C. *Bustos' Sentence Is Not Cruel and Unusual Punishment*

Bustos contends that his sentence of life imprisonment without the possibility of parole on count 1, as well as the consecutive life term plus 25 years to life imposed on count 2, constitutes cruel and unusual punishment under the federal and state constitutions. He has forfeited this contention, however, by failing in the trial court to object on this ground. (See *People v. Burgener* (2003) 29 Cal.4th 833, 886 [defendant forfeited cruel and unusual punishment claim "by failing to articulate an objection on federal constitutional grounds" in the trial court]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1231, fn. 17 [claims of constitutional error based on federal and state constitutions are waived in the absence of a constitutional objection in the trial court]; *People v. Johnson* (2013) 221 Cal.App.4th 623, 636 ["[a]ppellant forfeited the cruel and unusual punishment issue by not asserting it in the trial court"].)

Even if Bustos had not forfeited his constitutional argument, it would fail on the merits. The Eighth Amendment to the United States Constitution proscribes the infliction of "cruel and unusual punishments." Under this constitutional provision "the courts

examine whether a punishment is grossly disproportionate to the crime. We consider all the circumstances of the case, beginning with the gravity of the offense and the severity of the sentence. [Citation.] In the rare case where this threshold comparison raises an inference of gross disproportionality, the court then compares the defendant's sentence with those received by others in both the same state and other states. If this comparative analysis confirms the initial belief that the sentence is grossly disproportionate, then it is cruel and unusual. [Citation.]" (*People v. Murray* (2012) 203 Cal.App.4th 277, 284-285, fn. omitted, citing *Graham v. Florida* (2010) 560 U.S. 48, 59-60 [130 S.Ct. 2011, 176 L.Ed.2d 825].)

Article I, section 17 of the California Constitution prohibits the imposition of "[c]ruel or unusual punishment." "'To determine whether a sentence is cruel or unusual . . . as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], or, stated another way, that the punishment ""'shocks the conscience and offends fundamental notions of human dignity"'" [citation], the court must invalidate the sentence as unconstitutional.' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1231; accord *People v. Rountree* (2013) 56 Cal.4th 823, 860; *People v. Dillon* (1983) 34 Cal.3d 441, 486-489.) "Under the California Constitution, a sentence is cruel or unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity. Our review under this test includes an examination of the nature of the crime and the character of the defendant, and comparisons of the penalties in this state for more serious crimes and those imposed in other states for the same crime. [Citations.]" (*People v. Murray*, *supra*, 203 Cal.App.4th at p. 285; see *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1045.)

With respect to count 1, the felony murder of Tapia, Bustos "submits that his sentence of life without the possibility of parole was grossly disproportionate to his crime and violated the Eighth Amendment to the United States Constitution and the prohibition against cruel or unusual punishment under article I, section 17 of the California Constitution." In support of this contention Bustos relies on *Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] and *Enmund v. Florida* (1982) 458 U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140]. Neither of these cases aids Bustos.

In *Miller v. Alabama*, *supra*, 567 U.S. ___ [132 S.Ct. 2455] the United States Supreme Court held that a mandatory sentence of life without the possibility of parole imposed on a 14-year-old juvenile offender was cruel and unusual. The Supreme Court stated "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Id*. at p. ___ [132 S.Ct. at p. 2469].) Bustos, however, was 25 or 26 years old at the time he committed his offenses. Because he was an adult, *Miller* does not apply. (See *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221 [sentence of life without the possibility of parole plus one year is not cruel and or unusual under *Miller* and other cases involving juveniles because the defendant was 18, and therefore an adult, when he committed felony murder]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [because society recognizes that a child becomes an adult at the age of 18, the sentencing rationale applicable to juveniles did not apply to a defendant who was 18 years and five months old at the time of his offenses].)

In *Enmund v. Florida*, *supra*, 458 U.S. 782 the United States Supreme Court held that the Eighth Amendment does not "permit[] imposition of the death penalty on one such as Enmund who aids and abets a felony[, a robbery,] in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Id*. at p. 797.) *Enmund* is very distinguishable. First, Bustos was not sentenced to death. Second, Bustos intended to kill Hernandez and Tapia and employed lethal force in carrying out his criminal enterprise. Bustos and his accomplice drove Hernandez and Tapia, who were bound and

18

blindfolded with tape, from Riverside to a remote area in Sierra Madre where they simultaneously fired multiple rounds at their captives. The evidence showed that Bustos shot Hernandez, while his accomplice shot Tapia, execution style. Both victims sustained multiple gunshots to their heads and bodies. The evidence of intent to kill was overwhelming. We reject Bustos' assertion that "he has been unfairly signaled out from other equally or less culpable defendants who will at least have some chance of parole in their lifetime." Bustos' punishment was neither excessive nor unnecessary, and it does not shock the conscience or offend fundamental notions of human dignity.

Bustos also challenges the constitutionality of his sentence imposed on count 2, the attempted murder of Hernandez, and argues that he should serve it concurrently rather than consecutively. He argues that it is "cruel and unusual because it will be impossible for [him] to even begin to serve that sentence as he will never be eligible for parole on count 1." He further argues that "[a] sentence that is impossible to even begin serving serves no other purpose than to cause a defendant to lose hope. No legitimate societal goal is served by imposing such a sentence . . . ." There is no merit to this argument. Bustos will be in prison for the remainder of his life for the murder of Tapia. The fact that Bustos, for all practical purposes, will not be able to serve separately the sentence imposed for the attempted murder of Hernandez does not render his sentence cruel or unusual or mandate that he serve the sentence concurrently. (See *People v. Haller* (2009) 174 Cal.App.4th 1080, 1089-1090 [sentence that is too long to be served does not violate prohibition on cruel and unusual punishment]; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1377, 1383 [fact that defendant, who was sentenced to state prison for a determinate term of 115 years plus an indeterminate term of 444 years to life, cannot serve his sentence during his lifetime does not mean that his sentence is cruel and unusual punishment]; *People v. Ayon* (1996) 46 Cal.App.4th 385, 399 [sentence of 240 years to life, which is the equivalent of a life sentence without the possibility of parole, was not cruel or unusual], disapproved on another ground in *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10.) Bustos' sentence is severe, but so was his crime. (See *People v.*

19

*Szadziewicz* (2008) 161 Cal.App.4th 823, 846 ["extremely serious crimes . . . deserve severe punishment"].)

**DISPOSITION**

The judgment is affirmed.

SEGAL, J.[*]

We concur:

WOODS, Acting P. J.

ZELON, J.

---

[*] Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.